The BANK OF NEW YORK MELLON TRUST COMPANY, N.A., as Trustee, Defendant Below, Appellant,

v.

LIBERTY MEDIA CORPORATION and Liberty Media LLC, Plaintiffs Below, Appellees.

No. 284, 2011.

Supreme Court of Delaware.

Submitted: Sept. 14, 2011.
Decided: Sept. 21, 2011.

Joel Friedlander, Esquire, and Sean M. Brennecke, Esquire, Bouchard, Margules & Friedlander, P.A., Wilmington, Delaware, Steven D. Phol, Esquire (argued), Timothy J. Durken, Esquire, Brown, Rudnick, LLP, Boston, Massachusetts, Sigmund S. Wissner–Gross, Brown Rudnick LLP, New York, New York, Mark S. Baldwin, Esquire and Stephen R. Klaffky, Esquire, Brown, Rudnick LLP, Hartford, Connecticut, for Bank of New York Mellon Trust Company, N.A.

Donald J. Wolfe, Jr., Esquire, Arthur L. Dent, Esquire, Michael A. Pittenger, Esquire (argued), Brian C. Ralston, Esquire,

and Matthew F. Lintner, Esquire, Potter, Anderson & Corroon, LLP, Wilmington, Delaware, and Frederick H. McGrath, Esquire, Richard B. Harper, Esquire and Renee L. Wilm, Esquire, Baker Botts L.L.P., New York, New York, for Liberty Media Corporation and Liberty Media LLC.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the Court en Banc.

HOLLAND, Justice:

The plaintiffs-appellees, Liberty Media Corporation ("LMC") and its wholly owned subsidiary Liberty Media LLC ("Liberty Sub," together with LMC, "Liberty") brought this action for declaratory and injunctive relief against the defendant-appellant, the Bank of New York Mellon Trust Company, N.A., in its capacity as trustee (the "Trustee"). Liberty proposes to split off, into a new publicly traded company ("SplitCo") the businesses, assets, and liabilities attributed to Liberty's Capital Group and Starz Group (the "Capital Splitoff"). After Liberty announced the proposed splitoff of the businesses and assets attributable to its Capital and Starz tracking stock groups, Liberty received a letter from counsel for an anonymous bondholder.

In that letter, counsel for the bondholder stated that Liberty has pursued a "disaggregation strategy" designed to remove substantially all of Liberty's assets from the corporate structure against which the bondholders have claims, and shift those assets into the hands of Liberty's stockholders. Therefore, the bondholder contended that the transaction might violate the Successor Obligor Provision in the Indenture and threatened to declare an event of default. In response to that threat, Liberty commenced this action against the Trustee under the Indenture, seeking injunctive relief and a declaratory judgment that the proposed Capital Splitoff will not constitute a disposition of "substantially all" of Liberty's assets in violation of the Indenture.

The Capital Splitoff will be Liberty's fourth major distribution of assets since March 2004. The Trustee argues that when aggregated with the previous three transactions, the Capital Splitoff would violate a successor obligor provision in an indenture dated July 7, 1999 (as amended and supplemented, the "Indenture") pursuant to which Liberty agreed not to transfer substantially all of its assets unless the successor entity assumed Liberty's obligations under the Indenture ("Successor Obligor Provision"). It is undisputed that, if considered in isolation, and without reference to any prior asset distribution, the Capital Splitoff would not constitute a transfer of substantially all of Liberty's assets or violate the Successor Obligor Provision.

The Court of Chancery concluded, after a trial, that the four transactions should not be aggregated, and entered judgment for Liberty. The Court of Chancery concluded that the proposed splitoff is not "sufficiently connected" to the prior transactions to warrant aggregation for purposes of the Successor Obligor Provision. The Court of Chancery found that "[e]ach of the transactions resulted from a distinct and independent business decision based on the facts and circumstances that Liberty faced at the time," and that each transaction "was a distinct corporate event separated from the others by a matter of years," and that these transactions "were not part of a master plan to strip Liberty's assets out of the corporate vehicle subject to bondholder claims." Having held that aggregation would be inappropriate on the facts of this case, the Court of Chancery

did not reach Liberty's alternative argument that, even if the identified transactions were aggregated for purposes of the Successor Obligor Provision, they collectively would still not constitute a transfer of "substantially all" of Liberty's assets.

In this appeal, the Trustee contends that the Court of Chancery erred in ruling that Liberty's prior spinoff and splitoff transactions should not be aggregated with the Capital Splitoff for purposes of determining whether Liberty will have transferred substantially all of its assets. Specifically, the Trustee argues that the Court of Chancery's "adoption of the legally irrelevant step-transaction doctrine is not supported by the plain language of the Indenture and is inconsistent with the Indenture's actual language, which forbids disposition of substantially all of Liberty's assets through a 'series of transactions.'" Moreover, according to the Trustee, even if there were some basis for the Court of Chancery to look beyond the plain language of the Indenture, there is no evidence indicating that the parties intended to incorporate the step-transaction doctrine into the Successor Obligor Provision of the Indenture.

We conclude that the judgment of the Court of Chancery must be affirmed.

## FACTUAL BACKGROUND

What follows are the facts as found by the Court of Chancery in its post-trial opinion.

### Liberty's Emergence and Early Evolution

For two decades, Liberty has enjoyed a dynamic and protean existence under the leadership of its founder and chairman, Dr. John Malone. Liberty emerged in 1991 from Tele–Communications, Inc. ("TCI"), then the largest cable television operator in the United States, when a threat of federal regulation led TCI to separate its programming assets from its cable systems. TCI formed Liberty and offered its stockholders the opportunity to exchange their TCI shares for Liberty shares. At the time, Dr. Malone was Chairman, CEO, and a large stockholder of TCI. After the exchange offer, Dr. Malone was also Chairman, CEO, and a large stockholder of Liberty.

In 1994, Bell Atlantic entered into merger discussions with TCI. Bell Atlantic insisted that Liberty's assets be part of any acquisition. To facilitate a transaction, TCI reacquired Liberty by merger. The discussions with Bell Atlantic broke down, but Liberty remained part of TCI.

In 1998, Dr. Malone convinced AT & T to acquire TCI by merger at a significant premium.[1] In the transaction, both TCI and Liberty became wholly owned subsidiaries of AT & T. The agreement with AT & T allowed Liberty to operate autonomously, and Liberty's assets and businesses were attributed to a separate tracking stock issued by AT & T. Dr. Malone served as Liberty's Chairman.

### The Indenture

While it was a subsidiary of AT & T, Liberty entered into the Indenture with the Trustee. From July 7, 1999 through September 17, 2003, Liberty issued multiple series of publicly traded debt under the Indenture, the proceeds of which totaled approximately $13.7 billion. Liberty has since retired or repurchased much of that debt. As of September 30, 2010, debt secu-

---

1. *See In re Tele–Commc'ns, Inc. S'holders Litig.*, 2005 WL 3642727, at *1–3 (Del.Ch. Dec. 21, 2005).

rities with a total balance of approximately $4.213 billion remained outstanding.

| Name of Security and Interest Rate | Date of Issue | Original Amount | Balance as of 9/30/2010 |
|---|---|---|---|
| 8.5% Senior Debentures Due 2029 | 7/7/99 | $500 million | $287 million |
| 4% Exchangeable Senior Debentures Due 2029 | 11/16/99 | $869 million | $469 million |
| 8.25% Senior Debentures Due 2030 | 2/2/00 | $1 billion | $504 million |
| 3.75% Exchangeable Senior Debentures Due 2030 | 2/10/00 3/8/00 | $750 million (2/10/00) $60 million (3/8/00) | $460 million |
| 3.5% Exchangeable Senior Debentures Due 2031 | 1/11/01 | $600 million | $490 million |
| 3.25% Exchangeable Debentures Due 2031 | 3/8/01 | $817.7 million | $541 million |
| 3.125% Exchangeable Senior Debentures Due 2023 | 3/26/03 | $1.75 billion | $1.138 billion |
| 5.7% Senior Notes Due 2013 | 5/5/03 | $1 billion | $324 million |

### The Terms of the Indenture

The Indenture includes a successor obligor provision. This provision prohibits Liberty from selling, transferring, or otherwise disposing of "substantially all" of its assets unless the entity to which the assets are transferred assumes Liberty's obligations under the Indenture (thereby releasing Liberty from its obligations). Section 801 of the Indenture provides, in pertinent part:

[Liberty Sub] shall not consolidate with or merge into, or sell, assign, transfer, lease, convey or other[wise] dispose of all or substantially all of its assets and the properties and the assets and properties of its Subsidiaries (taken as a whole) to, any entity or entities (including limited liability companies) unless:

(1) the successor entity or entities . . . shall expressly assume, by an indenture (or indentures, if at such time there is more than one Trustee) supplemental hereto executed by the successor Person and delivered to the Trustee, the due and punctual payment of the principal of, any premium and interest on and any Additional Amounts with respect to all the Securities and the performance of every obligation in this Indenture and the Outstanding Securities on the part of [Liberty Sub] to be performed or observed . . .;

(2) immediately after giving effect to such transaction or series of transactions, no Event of Default or event which, after notice or lapse of time, or both, would become an Event of Default, shall have occurred and be continuing; and

(3) either [Liberty Sub] or the successor Person shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel [containing certain statements required by Section 801].

Indenture § 801 (the "Successor Obligor Provision"). A failure to comply with the obligations imposed by Article Eight constitutes an "Event of Default." *Id.* § 501.

The Indenture does not define the phrase "substantially all." Nor does the Indenture contain any covenants requiring Liberty to maintain a particular credit rating, a minimum debt coverage ratio, or a minimum asset-to-liability ratio.[2] The Indenture does not contain any provision directly addressing dividends and stock repurchases, which are the corporate vehicles to effectuate a spinoff (stock dividend) and a splitoff (stock redemption).

### Liberty's Continued Evolution Since the Splitoff From AT & T

In August 2001, AT & T split off Liberty to the holders of its publicly traded Liberty tracking stock. When Liberty reemerged as a public company, it held a "fruit salad" of assets, consisting mainly of minority equity positions in public and private entities. For example, Liberty owned single-digit-percentage stakes in large public companies such as Sprint, Viacom, and Motorola. Liberty also owned large minority positions in private companies such as Discovery Communications. Most of Liberty's assets, except for a few controlled operating businesses, did not generate any cash flow. The value of Liberty's holdings, which had been quite significant during the heady days of the internet bubble (recall that the Indenture was executed in 1999), fell significantly in 2000 and 2001 (the period leading up to the splitoff).

After the splitoff, Dr. Malone and the rest of Liberty's management team set out to build value at Liberty by rationalizing its investment portfolio. Put simply, Liberty wanted to use its minority investments to acquire controlling stakes in mutually supporting operating businesses that would generate cash flow. According to Dr. Malone,

> it was always obvious that the direction that the company needed to go—which was to—out of the cosmic dust, as it were, form some gravitational units that could then pull in these investment assets, monetize them and grow. It's always been a process of how do you convert from a portfolio of investments into a series of operating businesses.

Beginning in 2001, Liberty sought to own stakes in businesses that Liberty either controlled or saw a clear path to control. If Liberty did not control an asset and could not identify a path to control, then Liberty management evaluated all possible alternative uses for the asset. Over the ensuing decade, Liberty engaged in numerous transactions in pursuit of that overall strategy, frequently structuring its deals as swaps or exchanges to avoid triggering taxable events.

### International Cable

After separating from AT & T, Liberty looked first to build a cash-generating business in the area its management team knew best: cable television. Having sold the nation's largest cable provider to AT & T in 1999, Dr. Malone did not think it was feasible to make a comeback in the U.S. Instead, Liberty sought to expand, and consolidate, its international cable holdings.

---

**2.** *Compare, e.g.,* Committee on Trust Indentures and Indenture Trustees, ABA Section of Business Law, *Model Negotiated Covenants and Related Definitions,* 61 Bus. Law. 1439 (2006) (providing model covenants addressing these topics); Thomas O. McGimpsey & Darren R. Hensley, *Successor Obligor Clauses: Transferring "All or Substantially All" Corporate Assets in Spin–Off Transactions,* Colorado Lawyer 45 (Feb.2001) (describing different forms of covenants).

A series of international deals ensued. In 2001, Liberty agreed to acquire the largest cable television business in Germany from Deutsche Telekom. In 2002, Liberty increased its stake in UnitedGlobal-Com, Inc. ("UGC"), a cable provider active in Europe and Latin America. In 2002 and 2003, Liberty increased its stakes in Jupiter Telecommunications and Jupiter Programming Company, two cable businesses in Japan.

But Liberty's efforts to create an international cable business ran into obstacles. The Deutsche Telekom deal fell apart after encountering problems with German regulators. By 2004, it was clear that creating an international cable business would require massive capital infusions that would need to be funded with additional debt. Liberty management determined that the most effective way to raise capital would be to move the international assets off Liberty's balance sheet and into a separate entity. That new entity could raise debt on its own, and the risks of international expansion would be borne "directly by those shareholders of Liberty Media who chose to do so, rather than by the company at large."

Thus, in 2004, Liberty spun off Liberty Media International, Inc. ("LMI"), which held Liberty's controlling interest in UGC and stakes in other international cable companies. Liberty also contributed to LMI Liberty's shares of News Corp. preferred stock, a 99.9% economic interest in 345,000 shares of ABC Family Worldwide preferred stock, and $50 million in cash.

Liberty management believed that the LMI spinoff would best serve both Liberty and the new entity:

Creating a separate equity security will give existing Liberty Media shareholders and new investors the ability to concentrate their investment in either LMI, the remaining Liberty Media businesses, or both. We expect that this will increase the trading value of both securities, thereby reducing the discount in the current Liberty Media stock and creating better currencies for both entities to use in pursuit of acquisition activity. In addition, by their nature the LMI businesses can support higher levels of debt, which should generate higher equity returns.

The LMI spinoff was a significant transaction for Liberty. It removed $11.79 billion in assets (at book value) from Liberty's balance sheet, representing 19% of Liberty's total book value as of March 31, 2004—the date the Trustee contends should be used for purposes of determining what constituted "substantially all" of Liberty's assets. At the same time, Liberty avoided exposing itself to the massive borrowing that the international cable business required. If Liberty had retained the international assets and undertaken the transactions in which LMI later engaged, Liberty today would have an additional $21 billion in liabilities on its consolidated balance sheet, all senior to the public debt issued under the Indenture.

Notwithstanding the risks it faced, LMI has proved successful. The spun-off company, later renamed Liberty Global, Inc., is currently the largest cable operator outside of the United States. In 2009, Liberty Global reported assets (at book value) of $39.9 billion, total revenue of $11.1 billion, and operating income of $1.64 billion.

The Trustee views the LMI spinoff as the start of Liberty's disaggregation strategy. Commenting on the LMI spinoff in early 2005, Dr. Malone described it as "the first shoe to drop" and a "model we want to follow":

That's what we continuously look for . . . opportunities to carve out if necessary other businesses that can go off and be

part of a consolidation in their space, gain market power, improve profitability, appropriately use debt leverage, shelter taxes, or avoid corporate level taxes, and go on down the road in terms of maximizing shareholder value.... And that continues to be the plan today.

(Dr. Malone, testifying that Liberty's strategy was to "[c]onsolidate on the operating businesses, and figure out how to disaggregate the businesses where we couldn't find an efficient way to own, consolidate, and grow assets, that we hadn't been able to figure out how to do that").

### QVC

At the same time that Liberty management was attempting to develop a cash-generating international cable business, they also were evaluating another Liberty legacy investment: its minority stake in QVC, Inc. QVC was and remains the dominant cable shopping channel, and Liberty management liked QVC's "position as a market leader in its industry, ... QVC's ability to generate significant cash from operations and Liberty's ability to obtain access to such cash, and ... QVC's perceived significant international growth opportunities."

In September 2003, Liberty acquired control over QVC by purchasing Comcast Corporation's approximately 56.5% ownership stake for approximately $7.9 billion. Liberty paid $1.35 billion of the purchase price in cash, raised by issuing additional debt under the Indenture. Liberty also issued, directly to Comcast, $4 billion in Floating Rate Senior Notes under the Indenture. Liberty paid the balance of the purchase price with 217.7 million shares of Liberty Series A common stock, valued at $2.555 billion.

### Discovery

Also during 2003 and 2004, Liberty management explored alternatives for Discovery, a cable channel that Liberty owned in partnership with Cox Communications and Advance/Newhouse. Although Discovery was performing well, Liberty owned less than 50% of the equity, lacked control, did not have a clear path to control, and was restricted by a stockholders agreement from selling or otherwise monetizing its position.

Consistent with its strategy of increasing minority positions into control positions, Liberty approached its partners in an effort to develop a path to control. When these efforts failed, Liberty attempted to explore plans for monetizing the business by selling it or taking it public. Liberty's partners were not interested in that alternative either.

With their preferred alternatives blocked, Dr. Malone and the Liberty management team decided to dividend Liberty's Discovery shares to its stockholders, thereby giving them a direct ownership interest in Discovery. Liberty management hoped that as a result of the distribution, Cox Communications and Advance/Newhouse "would perhaps ultimately see the benefit of a public vehicle for valuation and management motivation." To facilitate the distribution, Liberty created Discovery Holding Company, transferred to it Liberty's stake in Discovery, plus a small operating company called Ascent Media and $200 million in cash, and then spun off the new entity to Liberty's stockholders.

The Discovery spinoff removed from Liberty's balance sheet assets with a book value of $5.825 billion, representing 10% of Liberty's total book value as of March 31, 2004. After the spinoff, Liberty's securities lost their investment-grade rating. Moody's cited concern with "management's long-term strategic and financial vision for the company, and likely resultant credit

protection levels." Moody's noted that "[t]he rating could stabilize if management evidenced both the ability and willingness to maintain or improve the asset coverage that represents the primary source of credit protection levels at present."

Like LMI, Discovery prospered post-spinoff. In 2009, Discovery reported assets with a book value of $10.997 billion, revenues of $3.5 billion, and operating income of $1.24 billion.

The Trustee points to the Discovery spinoff as a continuation of Liberty's "disaggregation strategy." In its 2004 shareholder letter, Liberty management stated that:

> [s]ince Liberty's inception 14 years ago, our overriding objective has been clear and consistent: to maximize the value of our shares. Over the years, we have accomplished this by executing three core strategies: owning businesses with significant built-in growth potential; making timely acquisitions that enable us to build on that growth potential and create new business lines; and actively managing our capital structure. In 2004, we introduced a fourth strategy of disaggregating businesses by distributing them to our shareholders. While this technique actually reduces the value of our shares, it also increases the wealth of our shareholders by giving them holdings in two companies instead of one.

Dr. Malone emphasized the disaggregation strategy in other public statements:

> [T]he focus at Liberty has been figuring out how to rationalize the compliment of assets that we have, how to regain market share in those businesses that we think have that potential and how to avoid double or triple taxation as we attempt to exploit the underlying values of the assets. And that's led us kind of to voice a philosophy right now for Liberty, which is disaggregate in order to consolidate....

### The Interactive and Capital Tracking Stocks

On November 9, 2005, Liberty announced the creation of two tracking stocks, one for Liberty's Interactive Group and the second for Liberty's Capital Group. Liberty created the tracking stocks to "help the investment and analyst communities to focus their attention on the underlying value of [Liberty's] assets." At the same time, Liberty management recognized that the trackers could serve as a first step toward future splitoffs. As Dr. Malone explained during Liberty's third quarter 2005 earnings call:

> As you know, we have spun off the international business and organized it. We've spun off Discovery Holdings and in the process of optimizing it, and so this creation of Liberty Interactive clearly signals a desire long-term for an ultimate separation, but it gives us the latitude to optimize taxes and take our time in the structuring of our debt liabilities and tax liabilities in the pendency of any ultimate spin off.

Dr. Malone noted that the creation of the trackers did not negatively affect Liberty's bondholders, because "during the pendency of a tracking stock structure, there is really no change in terms of the assets that the debtholders can look to." The Trustee infers from this statement that Dr. Malone knew that a splitoff would have a different—and negative—effect on Liberty's bondholders.

### More Deal–Making and Another Tracking Stock

In late 2004, News Corporation ("News Corp.") announced its intention to reincorporate from Australia to Delaware. Liberty management saw this as an opportunity

to increase Liberty's stake in News Corp. Liberty acquired approximately 16% of News Corp.'s stock through a combination of open-market purchases and derivatives. Dr. Malone correctly anticipated that News Corp.'s controlling stockholders, the Murdoch family, would not welcome Liberty's involvement and that the Murdoch family's desire to address Liberty's investment position would create opportunities for deal-making. After two years of negotiating, Liberty agreed in late 2006 to exchange its News Corp. stake for (i) a 38.5% interest in DirecTV, (ii) three regional sports networks, and (iii) $550 million in cash.

Meanwhile, Liberty continued to pursue transactions on other fronts involving both exchanges of minority positions for wholly owned assets and outright acquisitions. In April 2007, Liberty agreed to exchange its minority stake in CBS Corporation for ownership of a CBS local television station and $170 million in cash. In May 2007, Liberty exchanged a portion of its minority investment in Time Warner Inc. for ownership of the Atlanta Braves baseball organization, Leisure Arts, Inc., and $984 million in cash. During 2006 and 2007, Liberty acquired IDT Entertainment (later renamed Starz Media), Provide Commerce, Inc., FUN Technologies, Inc., BuySeasons, Inc., and Backcountry.com, Inc. In 2008, Liberty attributed Starz Media and other entertainment-related assets to a new tracking stock group called the Entertainment Group. This resulted in Liberty's assets being divided between three tracking stock groups: the Interactive Group, the Entertainment Group, and the Capital Group.

### Liberty Entertainment

The News Corp. swap gave Liberty an influential position in DirecTV. Consistent with its overall strategy, Liberty sought a path to control. In April 2008, Liberty purchased another 78.3 million shares of DirecTV for consideration of $1.98 billion in cash. Restrictions in the DirecTV certificate of incorporation, however, prohibited Liberty from acquiring more than 50% of DirecTV's equity unless Liberty offered to purchase 100% of the outstanding stock. To avoid triggering that provision, Liberty and DirecTV agreed that Liberty's equity ownership could exceed the 50% threshold, but Liberty's voting power would be capped at 48.5%. As a result of DirecTV's stock repurchase program, Liberty's equity ownership eventually climbed to 57%, although Liberty's voting power never exceeded 48.5%.

As 2008 wore on and the financial markets deteriorated, Liberty's management realized that financing to acquire the balance of DirecTV was not available. With the DirecTV charter provision otherwise blocking Liberty's path to control, Liberty management examined other potential alternatives. Ultimately, Liberty announced that it would split off its interest in DirecTV, along with certain other business, into a new entity called Liberty Entertainment, Inc. ("LEI"). Liberty and DirecTV then negotiated a transaction in which LEI would merge with DirecTV immediately after the splitoff. The splitoff and merger closed on November 19, 2009.

Liberty initially planned to split off all the assets attributed to the Entertainment Group, including the DirecTV stake, Starz, FUN Technologies, Inc., Liberty Sports Holdings, LLC, GSN, LLC and WildBlue Communications. Because Liberty management believed that DirecTV was undervaluing Starz and WildBlue in the merger negotiations, Liberty decided to retain those assets. Liberty management also considered the potential effect of the splitoff on bondholders. At that time, Dr. Malone stated that "[w]e had to retain [the] cash and economic value of Starz in

order to reassure the bondholders in Liberty that their interests were being protected." The Trustee cites this statement as evidence that Liberty knew its disaggregation strategy was approaching the "substantially all" limit. Dr. Malone and Liberty CEO Gregory Maffei testified at trial that they did not believe Liberty was legally required to hold back Starz and cash from the splitoff, but Liberty did so to protect itself during the height of the financial crisis and reassure bondholders and lenders.

The LEI splitoff removed from Liberty's balance sheet assets with a book value of $14.2 billion, representing 23% of Liberty's asset base as of March 31, 2004. The splitoff also removed roughly $2.2 billion in short-term debt that was attributable to LEI. DirecTV is now the world's leading provider of digital television entertainment services. In 2009, DirecTV reported assets with a book value of $18.26 billion, revenues of $21.57 billion, and operating profit of $2.67 billion. Dr. Malone served as Chairman of DirecTV until April 6, 2010.

### Sirius And IAC

As the first decade of the new millennium wound down, Dr. Malone and his team continued their deal-making. In February 2009, the ongoing financial crisis created the opportunity to make a favorable investment in Sirius XM Radio Inc. In return for a loan of $530 million, Liberty received shares of Sirius XM preferred stock, convertible into a 40% common stock interest, and a proportionate number of seats on Sirius XM's board. Liberty agreed to cap its stake at 50% until 2012. Sirius XM has since repaid the loan, while Liberty continues to hold its equity stake.

In December 2010, Liberty engaged in another swap transaction. Liberty exchanged its equity stake in InterActive-Corp ("IAC"), a company controlled by Barry Diller, for sole ownership of IAC's Evite.com and Gifts.com businesses and approximately $220 million cash.

### The Proposed Splitoff

In June 2010, Liberty announced the Capital Splitoff, in which Liberty proposes to split off the businesses allocated to its Capital and Starz Groups into SplitCo, a new public entity. SplitCo will own Starz Entertainment, Starz Media, Liberty Sports Interactive, Inc., the Atlanta Braves, True Position, Inc., and Liberty's interest in Sirius XM. The assets to be split off have a book value of $9.1 billion, representing 15% of Liberty's total assets as of March 2004. Dr. Malone is expected to serve as Chairman of the new entity's board, and Mr. Maffei is expected to serve as CEO.

After the Capital Splitoff, Liberty will hold the businesses attributed to Liberty's Interactive Group, consisting primarily of QVC, several e-commerce businesses (including Evite, Gifts.com, BuySeasons, and Bodybuilding.com), and minority equity stakes in Expedia, the Home Shopping Network ("HSN"), and Tree.com (which operates Lending Tree). All outstanding debt securities issued by Liberty will remain obligations of Liberty following the Capital Splitoff. Liberty's board analyzed Liberty's ability to service its outstanding debt after the splitoff, including debt at the QVC level and concluded that Liberty will have no difficulty servicing its debt.

### ISSUE ON APPEAL

The parties dispute whether Liberty will breach the Successor Obligor Provision by disposing of substantially all its assets in a series of transactions. It is undisputed, however, that the Capital Splitoff, standing alone, does not constitute "substantially all" of Liberty's assets. The threshold

question is, therefore, whether the Capital Splitoff should be aggregated with the prior spinoffs of LMI and Discovery and the splitoff of LEI.

The answer to that threshold question involves the construction of a boilerplate successor obligor provision in an indenture governed by New York law. That provision restricts Liberty's ability to dispose of "all or substantially all" of its assets unless the transferee assumes the Indenture debt. The question presented has not been addressed by the New York Court of Appeals, nor, to our knowledge, by any lower New York state court.

In the past, we have certified questions of first impression under New York law to the New York Court of Appeals.[3] In this case, certification is not realistically possible because the parties have requested a decision within one week of the oral argument before this Court. Consequently, as did the Court of Chancery, we must predict what the law of New York would be on this important question of first impression.

### Standard of Review

The legal issue in this case presents a mixed question of law and fact. The applicable standards of appellate review are well established.[4] After a trial, findings of historical fact are subject to the deferential "clearly erroneous" standard of review.[5] That deferential standard applies not only to historical facts that are based

upon credibility determinations but also to findings of historical fact that are based on physical or documentary evidence or inferences from other facts. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. Once the historical facts are established, the issue becomes whether the trial court properly concluded that a rule of law is or is not violated. Appellate courts review a trial court's legal conclusions de novo.[6]

### The Aggregation Principle

The Court of Chancery acknowledged that, as a theoretical matter, a series of transactions can be aggregated for purposes of a "substantially all" analysis.[7] Indeed, the Successor Obligor Provision at issue recognizes that aggregation may occur. That Provision states that Liberty can comply with the Successor Obligor Provision only if "immediately after giving effect to such transaction *or series of transactions,* no Event of Default or event which, after notice or lapse of time, or both, would become an Event of Default, shall have occurred and be continuing."[8] Courts applying New York law have determined that, under appropriate circumstances, multiple transactions can be considered together, *i.e.,* aggregated, when deciding whether a transaction constitutes a sale of all or substantially all of a corpo-

---

3. *Teachers' Ret. Sys. of Louisiana v. PricewaterhouseCoopers, LLP,* 998 A.2d 280 (Del. 2010).

4. *Hall v. State,* 14 A.3d 512, 516–17 (Del. 2011).

5. *Id.*

6. *Id.; see also Blake v. State,* 954 A.2d 315, 317–18 (Del.2008) (quoting *Guererri v. State,* 922 A.2d 403, 406 (Del.2007)).

7. *See* Ad Hoc Committee for Revision of the 1983 Model Simplified Indenture, *Revised Model Simplified Indenture,* 55 Bus. Law. 1115, 1134–35, 1186–87 (2000) ("In the context of asset disposition by transfer or lease, serious consideration must be given to the possibility of accomplishing piecemeal, in a series of transactions, what is specifically precluded if attempted as a single transaction.").

8. Indenture § 801(2) (emphasis added).

ration's assets.[9]

## Sharon Steel *Precedent*

The Court of Chancery began its analysis with the Second Circuit's 1982 decision in *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, which the court characterized as "the leading decision on aggregating transactions for purposes of a 'substantially all' analysis" in the context of a successor obligor provision. In *Sharon Steel*, the Second Circuit addressed a transaction in which a corporation, subject to a successor obligor provision in a bond indenture, had transferred corporate assets to multiple purchasers pursuant to a plan of liquidation. The court held that "boilerplate successor obligor clauses do not permit assignment of the public debt to another party in the course of a liquidation unless 'all or substantially all' of the assets of the company at the time the plan of liquidation is determined upon are transferred to a single purchaser." [10]

In *Sharon Steel*, after consummating a series of asset sales in furtherance of its liquidation plan, UV Industries, Inc. ("UV") sold its remaining assets to Sharon Steel in November of 1979. Sharon Steel sought to assume UV's indenture obligations under the successor obligor provision, arguing that it was permitted to do so without bondholder consent because the most recent transfer to Sharon Steel constituted a sale of "all or substantially all" of UV's assets as measured immediately prior to the transaction.[11] Under the indenture governing UV's debt securities, as under the Indenture in this case, a successor corporation could assume UV's obligations only if UV sold "all or substantially all" of its assets in the transaction. Certain debenture holders claimed that the assets sold to Sharon Steel did not constitute "substantially all" of UV's assets. Therefore, UV accordingly had defaulted under the indenture and as a consequence, the outstanding debt was immediately due and payable.

In *Sharon Steel*, the Second Circuit focused on the fact that all of the sales were pursued to accomplish the predetermined goal of liquidating UV under a formal plan of liquidation, even though only one asset sale had been identified at the time the liquidation plan was adopted. Characterizing the sales as a "piecemeal" liquidation, the Second Circuit explained that it would be inappropriate to regard the UV/Sharon Steel sale in isolation, given the substance and purpose of the "overall scheme to liquidate." [12] As a result, for purposes of determining whether "substantially all" of UV's assets had been transferred to Sharon Steel, thereby permitting Sharon Steel to assume the indenture obligations, the Second Circuit held that the assets transferred to Sharon Steel had to be measured

9. *See Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1051–52 (2d Cir. 1982) (comparing assets acquired by successor corporation to assets held by debtor corporation one and a half years earlier, prior to two third-party asset sales, when determining whether successor corporation acquired "substantially all" of the debtor's assets); *In re Associated Gas & Elec. Co.*, 61 F.Supp. 11, 28–31 (S.D.N.Y.1944) (treating transfers of subsidiaries by one controlled company to a second over a course of three years as a sale of substantially all assets where the transactions were "parts of a single scheme"), *aff'd*, 149 F.2d 996 (2d Cir.1945); *U.S. Bank Nat'l Ass'n v. Angeion Corp.*, 615 N.W.2d 425, 432–34 (Minn.Ct.App.2000) (reversing grant of summary judgment to debtor and finding that issues of fact existed as to whether two transactions viewed together constituted a sale of substantially all of the issuer's assets).

10. *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d at 1051.

11. *Id.* at 1046, 1049.

12. *See id.* at 1050–51.

against the totality of assets UV owned at the inception of the plan of liquidation.[13] Taking into account all the assets UV had transferred to various buyers since the adoption of the liquidation plan, the Second Circuit concluded that UV had not transferred to Sharon Steel "substantially all" of its assets. Therefore, UV had violated the successor obligor provision.[14]

The *Sharon Steel* court was careful to distinguish the "piecemeal liquidation" at issue in that case from situations where a company disposes of assets over time and not as part of a preconceived plan of liquidation. Specifically, the Second Circuit rejected UV's "literalist approach" under which Sharon Steel necessarily acquired "all of" UV's assets because it purchased whatever assets were left at the time of the sale.[15] In doing so, the Second Circuit distinguished sales of assets "in the regular course of UV's business" from *seriatim* sales as part of "an overall scheme to liquidate":[16]

> To the extent that a decision to sell off some properties is not part of an overall scheme to liquidate and is made in the regular course of business it is considerably different from a plan of piecemeal liquidation, whether or not followed by independent and subsequent decisions to sell off the rest. A sale in the absence of a plan to liquidate is undertaken because the directors expect the sale to strengthen the corporation as a going concern.... The fact that piecemeal

sales in the regular course of business are permitted thus does not demonstrate that successor obligor clauses apply to piecemeal liquidations, allowing the buyer last in time to assume the entire public debt.[17]

In *Sharon Steel,* the Second Circuit found that aggregation was appropriate because the individual sale transactions at issue were part of a "plan of piecemeal liquidation" and an "overall scheme to liquidate."[18] Conversely, where asset transactions are not piecemeal components of an otherwise integrated, pre-established plan to liquidate or dispose of nearly all assets, and where each such transaction stands on its own merits without reference to another, courts have declined to aggregate for purposes of a "substantially all" analysis.[19]

### Sharon Steel *Applied*

In applying *Sharon Steel* to the facts of this case, the Court of Chancery carefully assessed whether the trial evidence demonstrated that Liberty had developed a plan or scheme to dispose of its assets piecemeal with a goal of liquidating nearly all its assets, or removing assets from the corporate structure to evade bondholder claims. The Court of Chancery made a legal conclusion that there was no basis in the trial record for such a determination and stated:

> If the evidence at trial had shown, as in *Sharon Steel,* a plan to engage in *seria-*

13. *Id.* at 1051.

14. *Id.* at 1051–52.

15. *Id.* at 1049.

16. *Id.* at 1050.

17. *Id.* at 1050–51.

18. *Id.* at 1050.

19. *See id.* (distinguishing the "piecemeal liquidation" at issue from situations in which a company disposes of assets over time in the regular course of its business and not as part of a preconceived plan of liquidation); *Bank of N.Y. v. Tyco Int'l Grp., S.A.,* 545 F.Supp.2d 312, 320–22 (S.D.N.Y.2008) (holding that integration doctrine of *Sharon Steel* did not apply where there was no plan to liquidate). *See also Bacine v. Scharffenberger,* 1984 WL 21128, at *3 (Del.Ch. Dec. 11, 1984).

*tim* distributions that would remove assets from Liberty's corporate form and evade the bondholders' claims, then those otherwise separate transactions could be aggregated to determine if the end result constituted a disposition of substantially all of Liberty's assets. Under those circumstances, I would have compared Liberty's business mix as it existed when the plan was adopted with Liberty's business mix as it will exist after the Capital Splitoff. The evidence, however, does not support such a plan.

The Court of Chancery's legal conclusion rests on its factual finding that aggregating the four transactions is not warranted because each transaction was the result of a discrete, context-based decision and not as part of an overall plan to deplete Liberty's asset base over time. The court stated:

> Having reviewed the documentary record and listened to the witnesses testify at trial, I find that the Capital Splitoff is not sufficiently connected to the LMI and Discovery spinoffs or the LEI splitoff to warrant aggregating the four transactions. Each of the transactions resulted from a distinct and independent business decision based on the facts and circumstances that Liberty faced at the time. Although the transactions share the same theme of distributing assets to Liberty's stockholders, they were not part of a master plan to strip Liberty's assets out of the corporate vehicle subject to bondholder claims. Rather, each transaction reflected a context-driven application of the overarching business strategy that Liberty has followed since separating from AT & T: consolidate ownership of businesses where Liberty

can exercise control or has a clear path to control, while exploring all possible alternatives for assets that do not fit this profile. . . . [Liberty] has not followed a strategy of disposing of substantially all of its assets.

The Court of Chancery could have ended its analysis with the above-described application of the *Sharon Steel* holding to the facts of this case. The Court of Chancery decided, however, that the *Sharon Steel* opinion did not set forth a clear standard for determining when a series of transactions should be aggregated for purposes of a "substantially all" analysis. The Court of Chancery added a second layer of analysis, which it described as "doctrinal hindsight," to conclude that the *Sharon Steel* holding "fits within the step-transaction framework" and proceeded to apply that analytical framework to the facts of this case.

### Step–Transaction Doctrine Applied

The Court of Chancery had previously applied the "step-transaction" doctrine in *Noddings Investment Group, Inc. v. Capstar Communications, Inc.*[20] In *Noddings*, the court was asked to determine whether a spinoff and merger could be considered together for purposes of an adjustment provision of a warrant governed by New York law. The Court of Chancery analyzed the facts under the "step-transaction" doctrine, which

> treats the "steps" in a series of formally separate but related transactions involving the transfer of property as a single transaction, if all the steps are substantially linked. Rather than viewing each step as an isolated incident, the steps

---

**20.** *Noddings Inv. Grp., Inc. v. Capstar Commc'ns, Inc.*, 1999 WL 182568 (Del.Ch. Mar. 24, 1999), *aff'd* 741 A.2d 16 (Del.1999).

are viewed together as components of an overall plan.[21]

■ The step-transaction doctrine applies if the component transactions meet one of three tests. First, under the "end result test," the doctrine will be invoked "if it appears that a series of separate transactions were prearranged parts of what was a single transaction, cast from the outset to achieve the ultimate result."[22] Second, under the "interdependence test," separate transactions will be treated as one if "the steps are so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series."[23] The third and "most restrictive alternative is the binding-commitment test under which a series of transactions are combined only if, at the time the first step is entered into, there was a binding commitment to undertake the later steps."[24]

In evaluating the trial evidence, the Court of Chancery used the "three lenses of the step-transaction doctrine" (the binding-commitment test, the interdependency test, and end result test) as a doctrinal tool to "bring the picture into sharper focus" in applying aggregation principles to the facts of this case. The court found that the binding-commitment test does not apply because none of the transactions was contractually tied to any of the others. It also determined that the interdependency test

did not warrant aggregation because "[e]ach of the transactions was a distinct corporate event separated from the others by a number of years." Each transaction "stood on its own merits," and "[n]one was so interdependent on another that it would have been fruitless in isolation." Finally, turning to the end result test, the Court of Chancery carefully assessed whether the trial evidence in any way suggested that Liberty had developed a plan or scheme to dispose of its assets piecemeal with a goal of liquidating, disposing of nearly all its assets, or removing assets from the corporate structure to evade bondholder claims. It found no basis in the trial record for such a conclusion.

The Trustee argues that "*Sharon Steel* does not hold that a 'series of transactions' means a step-transaction." Moreover, the Trustee submits, "even if *Sharon Steel* fits within [the step-transaction framework] it does not follow that the Second Circuit intended to apply a step-transaction *requirement* for aggregating transactions under an indenture." The Trustee argues that "the fact that the Second Circuit never mentioned the step-transaction doctrine compels the conclusion that it did not intend to do so."

The Trustee also points to language in the American Bar Foundation's *Commentaries on Model Debenture Indenture Pro-*

---

21. *Id.* at *6 (quoting *Greene v. United States*, 13 F.3d 577, 583 (2d Cir.1994)). *See also In re Kelly*, 2005 WL 3879099, at *7–8 (N.Y.Div. Tax.App. Dec. 8, 2005) (applying step-transaction doctrine to aggregate, for tax purposes, a "series" of real estate transactions which were in substance a single deal); *Gatz v. Ponsoldt*, 925 A.2d 1265, 1280 & n. 31 (Del. 2007) (citing various doctrines, including step transaction, in connection with observation that Delaware Courts should look to the substance of transactions, rather than form); *Twin Bridges Ltd. P'ship v. Draper*, 2007 WL 2744609, at *9–10 (Del.Ch. Sept. 14, 2007) (applying step-transaction doctrine; treating

amendment to limited partnership agreement and subsequent merger as "part and parcel of one integrated transaction").

22. *Noddings Inv. Grp., Inc. v. Capstar Commc'ns, Inc.*, 1999 WL 182568 at *6 (internal quotation omitted).

23. *Id.* (internal quotation omitted).

24. *Id.* (internal quotation omitted). *See generally In re: Big V Hldg. Corp.*, 267 B.R. 71, 92–93 (Bankr.D.Del.2001) (describing tests).

*visions* which shows that the evolution of the Successor Obligor Provision in this case does not incorporate the step-transaction doctrine. The Trustee notes that this Court and others have looked to the American Bar Foundation's *Commentaries on Model Debenture Indenture Provisions* as "an aid to drafting and construction" of common indenture language.[25] Our examination of *Model Provisions and Commentary* leads us to conclude that the influence of the *Sharon Steel* decision on the Model provisions is more instructive and helpful than the absence of any reference to the step-transaction doctrine.

### Boilerplate Provisions Require Uniform Interpretation

 Successor obligor provisions in bond indentures consist of market-facilitating boilerplate language. Courts endeavor to apply the plain terms of such provisions in a uniform manner to promote market stability.[26] The Court of Chancery has previously noted that "boilerplate provisions" in indentures are "not the consequence of the relationship of particular borrowers and lenders and do not depend upon particularized intentions of the parties to an indenture."[27] Therefore, in interpreting boilerplate indenture provisions, "courts will not look to the intent of the parties, but rather the accepted common purpose of such provisions."[28] In this case, the Court of Chancery properly recognized the boilerplate character of the Indenture's Successor Obligor Provision and correctly emphasized the importance of uniform interpretation.

The Trustee responds that although the Successor Obligor Provision at issue here is "boilerplate" (*i.e.*, was not the subject of specific negotiation between the parties), it is not the standard successor obligor provision boilerplate found in any of the various iterations of the model indenture. The Trustee and Liberty both acknowledge, however, that the "series of transactions" language in the Indenture is the result of a specific recommendation contained in the comments to the *Model Simplified Indenture*, which counseled draftsmen to give "serious consideration" to the risks posed by the "piecemeal" disposition of assets through "a series of transactions." The inclusion of the phrase "series of transactions" in the Indenture, the Trustee argues, broadened the meaning and scope of the Successor Obligor Provision. That argument is not persuasive.

The "series of transactions" language first appeared in a comment to the *Model Simplified Indenture*,[29] published five months after the *Sharon Steel* decision.

**25.** *Kaiser Aluminum Corp. v. Matheson*, 681 A.2d 392, 397 (Del.1996); *see also NML Capital v. Republic of Argentina*, 621 F.3d 230, 241–42 (2d Cir.2010); *The Bank of New York v. First Millennium, Inc.*, 598 F.Supp.2d 550, 565 (S.D.N.Y.2009), *aff'd*, 607 F.3d 905 (2d Cir.2010).

**26.** *See Wilmington Trust Co. v. Tropicana Entm't, LLC*, 2008 WL 555914, at *6 (Del.Ch. Feb. 29, 2008) ("it is important that language routinely ... employed in [indentures] be accorded a consistent and uniform construction"); *see also Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d at 1048 ("uniformity in interpretation is important to the efficiency of capital markets").

**27.** *San Antonio Fire & Police Pension Fund v. Amylin Pharms., Inc.*, 983 A.2d 304, 314 (Del. Ch.2009) (quoting *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d at 1048), *aff'd*, 981 A.2d 1173 (Del.2009).

**28.** Dennis J. Connolly & William Hao, *X Marks The Spot: Contractual Interpretation of Indenture Provisions*, 17 J. Bankr.L. & Prac. 6 Art. 1, 12 (2008).

**29.** *See* Section of Corporation, Banking and Business Law, American Bar Association, *Model Simplified Indenture*, 38 Bus. Law. 741, 791 (1983).

That comment cautions that "serious consideration must be given to the possibility of accomplishing *piecemeal, in a series of transactions*, what is specifically precluded if attempted as a single transaction."[30] Liberty argues that the comment was designed to address the same concerns at issue in *Sharon Steel.* In support of that argument, it points to the fact that the *Revised Model Simplified Indenture,* promulgated in May 2000, contains the same commentary, but adds a citation to *Sharon Steel.*[31] Accordingly, Liberty submits, the only fair conclusion to be drawn from the presence of "series of transactions" language in a post-*Sharon Steel* successor obligor provision (such as the one at issue here) is that the additional language is meant to underscore that a disposition of "substantially all" assets may occur by way of either a single transaction or an integrated series of transactions, as occurred in *Sharon Steel.* We agree.

 Liberty's Indenture was executed many years after the Second Circuit's decision in *Sharon Steel.* There is no evidence in the record that the "series" language was included for any reason other than to clarify that the Successor Obligor Provision should be interpreted in the same manner as the one at issue in *Sharon Steel.* The trial testimony established— and the Trustee admits—that the Successor Obligor Provision was never a subject of negotiations between the parties in the case. Had the parties to the Indenture intended to create an asset disposition covenant with a broader scope than the standard, boilerplate successor obligor covenant, it was incumbent upon them to include it in a separate, negotiated covenant. As two commentators have noted:

> *Sharon Steel* illustrates the narrow construction of indenture provisions and the underlying concerns that inform the interpretation of indenture provisions by the courts. It is therefore important that negotiated provisions in an indenture be not only explicit *but also distinct from boilerplate provisions.* Modifications to common indenture provisions *will unlikely yield additional rights* as courts will not look to the intent of the parties, but rather the accepted common purpose of such provisions.[32]

In *Airgas, Inc. v. Air Products and Chemicals,* this Court recently noted that practice and understanding in the real world are relevant and persuasive, when interpreting similar language in a contractual provision.[33] It is important to the efficiency of capital markets that language routinely used in indentures be accorded a consistent and uniform construction.[34]

Liberty points out that at the time the Indenture was established, there were more rigorous model provisions available that explicitly required consideration of prior asset dispositions in determining the legal effect of a later disposition of any substantial part of an issuer's assets. For example, Sample Covenant 1 of Section 10–13 in the *Commentaries* states:

> Subject to the provisions of Article Eight, the Company will not convey, transfer or lease, any substantial part of

---

30. *Id.* at 791 (emphasis added).

31. *See* Ad Hoc Committee for Revision of the 1983 Model Simplified Indenture, *Revised Model Simplified Indenture,* 55 Bus. Law. 1115, 1186–87 (2000).

32. Dennis Connolly & William Hao, *X Marks the Spot: Contractual Interpretation of Inden-*

*ture Provisions,* 17 J. Bankr.L. & Prac. 6 Art. 1, 12 (2008) (emphasis added).

33. *Airgas, Inc. v. Air Products and Chemicals,* 8 A.3d 1182 (Del.2010).

34. *See Wilmington Trust Co. v. Tropicana Entm't, LLC,* 2008 WL 555914 at *6.

its assets unless, in the opinion of the Board of Directors, such conveyance, transfer or lease, considered together with all prior conveyances, transfers and leases of assets of the Company, would not materially and adversely affect the interest of the Holders of the Debentures or the ability of the Company to meet its obligations as they become due.[35]

The Liberty Indenture contains no such provision. As the Court of Chancery also noted, there is also no covenant "requiring Liberty to maintain a particular credit rating, a minimum debt coverage ratio, or a minimum asset-to-liability ratio," and "the Indenture does not contain any provision directly addressing dividends and stock repurchases, which are the corporate vehicles to effectuate a spinoff (stock dividend) and a splitoff (stock redemption)." This Court has consistently held that the rights of bondholders and other creditors are fixed by contract.[36] As the Court of Chancery properly recognized, it would be inconsistent with the concept of private ordering to expand the scope of the Successor Obligor Provision by rewriting the Indenture contract to include by implication additional protections for which the parties could have—but did not—provide by way of a covenant separate and apart from the boilerplate successor obligor provision.[37]

### New York Law

■ In the context of the "substantially all" analysis under a boilerplate successor obligor provision in an indenture, and given the near absence of any authoritative New York case law, we conclude that the principles articulated in *Sharon Steel* are the proper basis for determining, under New York law, the nature and degree of interrelationship that will warrant aggregation of otherwise separate and individual transactions as a part of a "series." In *Sharon Steel*, the Second Circuit determined that aggregation is appropriate only when a series of transactions are part of a "plan of piecemeal liquidation" and "an overall scheme to liquidate" and not where each transaction stands on its own merits without reference to the others.

■ The Court of Chancery carefully considered and applied *Sharon Steel* to the facts before it, and concluded that the Capital Splitoff "is not sufficiently connected to the LMI and Discovery spinoffs or the [Entertainment] splitoff to warrant aggregating the four transactions." The Court of Chancery held:

> Following a consistent business strategy and deploying signature M & A tactics does not transmogrify seven years of

---

**35.** American Bar Foundation, *Commentaries On Model Debenture Indenture Provisions* § 10–13, at 426–27 (1965).

**36.** *NACEPF, Inc. v. Gheewalla*, 930 A.2d 92, 99 (Del.2007); *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 182 (Del. 1986).

**37.** *See Bank of N.Y. v. Tyco Int'l Grp., S.A.*, 545 F.Supp.2d at 322 (declining to infer into successor obligor provision additional protection available to noteholders in existing model covenants, where parties could have included such protection in indenture but did not); *see also Noddings Inv. Grp., Inc. v. Capstar Commc'ns, Inc.*, 1999 WL 182568, at *4 (rejecting claim that a spin-off should be interpreted as a reorganization for purposes of a warrant agreement based on absence of "spin-off protection" provision similar to those found in the Model Debenture Indenture); *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 716 F.Supp. 1504, 1508 (S.D.N.Y.1989) ("There being no express covenant ... this Court will not imply a covenant to prevent the recent LBO and thereby create an indenture term that, while bargained for in other contexts, was not bargained for here, and was not even within the mutual contemplation of the parties.").

discrete, context-specific business decisions into a single transaction. Liberty has engaged in acquisitions and divestitures as part of the regular course of its business. Liberty did not engage in an "overall scheme" to sell substantially all of its assets.[38]

In support of that finding and legal conclusion—and without regard to the step-transaction doctrine—the Court of Chancery cited only the *Sharon Steel* decision as authority for its holding.

We conclude it is unnecessary to reach or decide whether the step-transaction doctrine and its three component tests would be adopted by the New York Court of Appeals as definitive New York law to determine whether to aggregate a series of transactions in a "substantially all" analysis. Given the Court of Chancery's factual findings, even if the Court of Chancery had not utilized "[t]he three lenses of the step-transaction doctrine" as a doctrinal tool to "bring the picture into sharper focus," the legal conclusion in this case would have been the same under our independent reading of *Sharon Steel.*

The Trustee concedes that the Capital Splitoff, viewed in isolation, does not constitute a disposition of substantially all of Liberty's assets. On the facts of this case, the Court of Chancery properly held that aggregation is not appropriate. Accordingly, Liberty was entitled to a declaration that the Capital Splitoff does not violate the Successor Obligor Provision in the Indenture.

### *Conclusion*

The judgment of the Court of Chancery is affirmed.

---

**38.** *Sharon Steel Corp. v. Chase Manhattan* *Bank, N.A.,* 691 F.2d at 1050.