**Carl HALL, Defendant Below–Appellant,**

v.

**STATE of Delaware, Plaintiff Below–Appellee.**

**No. 555, 2010.**

Supreme Court of Delaware.

Submitted: Feb. 1, 2011.
Decided: March 3, 2011.

---

Natalie S. Woloshin, Esquire, Woloshin, Lynch, Natalie & Gagne, Wilmington, Delaware, for appellant.

Maria T. Knoll, Esquire, Department of Justice, Wilmington, Delaware, for appellee.

Before HOLLAND, JACOBS and RIDGELY, Justices.

HOLLAND, Justice:

The defendant-appellant, Carl Hall ("Hall"), appeals from the Superior Court judgments that were entered following his convictions for Maintaining a Dwelling for the Keeping of Controlled Substances, Possession of Drug Paraphernalia, Possession of a Deadly Weapon by a Person Prohibited ("PDWPP"), and Possession of Ammunition by a Person Prohibited. The sole issue in this direct appeal is Hall's contention that the Superior Court erred in denying his motion to suppress.

We have concluded that Hall's arguments are without merit. Therefore, the judgments of the Superior Court must be affirmed.

### Facts

Early one morning, several police officers responded to a 911 hang-up call. After banging on the door of the residence for several minutes, the police officers saw Hall "poke his head out the window" and "he appeared intoxicated."[1] Officer Paul Smack testified that he heard dogs barking and that it "sound[ed] like a small party was going on inside, based on all the screaming and yelling that was going on."

Marva Congo, who was "very agitated," eventually opened the door and the police officers gained entry.[2] Smack then noticed that Hall had "a fairly deep gaping wound" on the side of his face. Smack testified that "at that point we did not

---

1. Officer Paul Smack testified that Hall's "eyes were very bloodshot, and he kind of stared with a blank expression."

2. Smack also testified: "[W]hen we were initially knocking on the door, I heard a female voice come from the door in the close vicinity to where we were, and then I heard a female voice screaming in the far side of the residence, which was one of the reasons why I was unable to ascertain if that was Ms. Congo's voice both times or not. All I know is that I heard a female voice at the door, a female voice at the far side of the residence that was screaming, and then next, the next sequence of events was that they were both at the door."

know what we were looking at, if it was an assault that occurred outside the home or inside the home, but we had to really take it as we had it that Mr. Hall was indeed injured seriously, and that was really all we had at the time."

Ten minutes later, because Congo was still very agitated, Officer Clarke "escorted [her] outside kicking and screaming." At that time, five police officers were at the house. Smack asked Hall how he was injured, and Hall replied: "[we] were out at a club and something happened." Congo then informed Smack that Hall had grabbed her, and Hall was handcuffed.

A short time after Clarke escorted Congo from the residence, Officer Clarke yelled, "gun." Clarke and Officer Andrea Mancuso, at the direction of their supervisor, had conducted a sweep of the residence and discovered a gun on the kitchen countertop. Mancuso testified that she performed the "protective sweep" because "[a]t that point there was so much going on, and Officer Smack and Officer Clarke weren't able to check the residence to make sure anyone else was inside it, due to it being a 911 hang-up call we weren't sure if there was anyone else involved, you could hear dogs barking, weren't sure if they were barking at someone." [3]

Hall was charged by indictment with Manufacturing a Non–Narcotic, Maintaining a Dwelling for the Keeping of Controlled Substances, Possession of Drug Paraphernalia, PDWPP, Possession of Ammunition by Person Prohibited, and two counts of Offensive Touching of a law enforcement officer. Hall filed a pre-trial motion to suppress the evidence that was

seized from the residence. The Superior Court held a suppression hearing and denied the suppression motion in a ruling from the bench and in a supplemental letter. In the letter, the Superior Court further explained its bench ruling:

> [T]he police accurately believed they were intervening in a violent, domestic dispute. That intervention directly led to the arrest of the probable protagonists and their removal. Before leaving the scene, the police were justified in conducting a limited sweep to make certain no one else, especially another injured adult or child, was left behind. And, the police also should have been concerned that they were leaving the dog(s) in safety and the premises in a secure condition.

The State *nolle prossed* the manufacturing and offensive touching counts prior to trial. Hall was found guilty of all the remaining charges. He was sentenced to be incarcerated for twelve years at Level V, suspended after three years at varying levels of probation.

### Emergency Exception Doctrine

■ In *Guererri v. State*,[4] this Court explained that "[u]nder certain limited circumstances, [ ] police are justified in making a warrantless entry and conducting a search of the premises to provide aid to people or property." [5] One of those limited circumstances is a warrantless search of a house after the occurrence of a violent crime when it is reasonable to believe that dangerous people or victims are on the premises—the so-called "emergency exception" doctrine.[6] In applying that doc-

---

3. Mancuso also testified that the barking "was coming from the back of the house. I'm not sure, I couldn't say what room."

4. *Guererri v. State*, 922 A.2d 403 (Del.2007).

5. *Id.* at 406.

6. *Id.* (citing *Mincey v. Arizona*, 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978)). *See also Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006).

trine, in *Guererri*, we replaced a reasonableness inquiry with a three-part test.[7]

In *Guererri*, we held that to establish the legality of a warrantless search under the emergency exception doctrine, the State must show, by a preponderance of the evidence, the following: first, "[t]he police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property;" second, "[t]he search must not be primarily motivated by intent to arrest and seize evidence;" third, "[t]here must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched."[8] In *Guererri*, we applied the new three-part test to the facts of that case. We later applied the *Guererri* framework in *Blake v. State*.[9]

■ The first part of the *Guererri* test is not at issue here.[10] With regard to the second part, in *Guererri*, we explained that "officers must conduct the search primarily to achieve a community caretaking function, rather than to pursue a law enforcement objective."[11] The community caretaking function includes a concern for the health and safety of any people that might be found in the searched area.[12] In explaining the third part of the *Guererri* test, we held that there must be a "direct relationship between the area to be searched and the emergency,"[13] and "the search may include not only a search of the premises to find people in need of aid, but also a protective sweep to ensure that no further danger is present."[14] We also explained that the scope of a warrantless search under the emergency aid exception is limited to "those areas necessary to respond to the perceived emergency."[15]

### Standard of Review

■ The legality of a warrantless search under the emergency doctrine creates a mixed question of law and fact. The standard of appellate review is well established:

Findings of historical fact are subject to the deferential "clearly erroneous" standard of review. This deferential standard applies not only to historical facts that are based upon credibility determi-

---

7. This Court had previously articulated a reasonableness test. *See Patrick v. State*, 227 A.2d 486, 489 (Del.1967) ("[T]he criterion is the reasonableness of the belief of the police as to the existence of an emergency....").

8. *Guererri v. State*, 922 A.2d at 406 (citations omitted).

9. *Blake v. State*, 954 A.2d 315 (Del.2008).

10. *See* Appellant's Amended Opening Brief, at 12 ("At the suppression hearing, the defense did not challenge the initial entry into the residence.... Hall's constitutional challenge relates to the subsequent search of the residence after Hall and Congo were in custody. Therefore, the issue in this case is whether the warrantless search of Hall's residence satisfied the second and third prongs of the *Guererri* test.").

11. *Guererri v. State*, 922 A.2d at 407 (citing *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973)).

12. *See id.* We also have explained that the community caretaking doctrine "appropriately reflects that the role of police in Delaware is not limited to merely the detection and prevention of criminal activity, but also encompasses a non-investigative, non-criminal role to ensure the safety and welfare of our citizens." *Williams v. State*, 962 A.2d 210, 218 (Del.2008).

13. *Guererri v. State*, 922 A.2d at 407 (quoting *People v. Mitchell*, 39 N.Y.2d 173, 383 N.Y.S.2d 246, 347 N.E.2d 607, 610 (1976)).

14. *Id.* (citing *Mincey v. Arizona*, 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978)).

15. *Id.* (quoting *United States v. Stafford*, 416 F.3d 1068, 1075 (9th Cir.2005)).

nations but also to findings of historical fact that are based on physical or documentary evidence or inferences from other facts. Where there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous. Once the historical facts are established, the issue is whether an undisputed rule of law is or is not violated. Accordingly, appellate courts review *de novo* whether there is probable cause for an arrest, as a matter of law.[16]

### Record Supports Emergency Exception

■ Hall argues that the Superior Court erred because it applied a general reasonableness standard, instead of applying the *Guererri* test to assess the legality of the search of Hall's residence. Hall bases this argument on the Superior Court's closing comments from the bench: "So taking everything into account, that is, the totality of the circumstances, the Court finds that it was reasonable for the police, having arrived at the scene of a bona fide emergency and having entered a dwelling in order to deal with that emergency, and rightly so, but for the police having gone in, who knows what would have happened, the police were within the bounds of reasonableness to have given the first floor of the residence a once-over before they left."

The record reflects, however, that the Superior Court applied the *Guererri* test. During the suppression hearing, the following exchange occurred:

The Court: So sort of the first and second [*Guererri*] prongs [are] not so much where the line is drawn, the line

is drawn over whether there was a reasonable basis, and you say approximating probable cause to associate the emergency with the area that was searched, the emergency in the living room with the kitchen which was searched, that's where you are?

Defense counsel: That is correct.

The Superior Court then stated: "I'm going to take a break now because I want to actually reread *Guererri* very carefully."

After a recess, the Superior Court explained, in part:

The question becomes can they conduct a quick sweep of the residence, and in particular the back room on the first floor of the kitchen to see if anyone else is there. And although in this case, unlike *Guererri*, no one had suggested that there was anyone in the back, in this case, unlike *Guererri*, the police knew that they were dealing with a violent situation, or at least they had probable cause to believe, not just something approximating probable cause, but they had probable cause to believe there was a violent domestic altercation between the first two people that they confronted in the place.

Accordingly, the record reflects that the Superior Court did apply the three-part *Guererri* analysis to the facts of this case.

■ Hall argues that the State did not satisfy the second part of the *Guererri* test—"[t]he search must not be primarily motivated by intent to arrest and seize evidence."[17] The trial judge accepted the officers' testimony that the search was not primarily motivated by those ends.[18] The

---

16. *Blake v. State*, 954 A.2d at 317–18 (quoting *Guererri v. State*, 922 A.2d at 406).

17. *Guererri v. State*, 922 A.2d at 406 (citations omitted).

18. The Court: "You ought to agree, because I don't think you can make much of an argument that the police went into the kitchen for any reason but to look for someone else, as opposed to going back there with the intent of making an arrest or to look for evidence...."

record reflects that the officers directed their community caretaking function at insuring the health and safety of any people that might be found in the searched area, given, among other things, the 911 hang-up call, the various screams that could be heard from outside the house, and evidence of violence as indicated by Hall's injury. The Superior Court's acceptance of the officers' explanations is a credibility determination that is entitled to deference on appeal.[19] Accordingly, we hold that the Superior Court properly applied part two of the *Guererri* test.

Hall also argues that the State did not satisfy the third part of the *Guererri* test—"[t]here must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched."[20] Under the facts of this case, the officers were justified in performing a limited sweep of the first floor of the residence. The 911 hang-up call raised concerns about whether someone else may have been in the residence.

Officer Smack testified that it "sound[ed] like a small party was going on inside, based on all the screaming and yelling that was going on," which suggested that Hall and Congo may not have been the only people in the house. Smack also testified: "[W]hen we were initially knocking on the door, I heard a female voice come from the door in the close vicinity to where we were, and then I heard a female voice screaming in the far side of the residence, which was one of the reasons why I was unable to ascertain if that was Ms. Congo's voice both times or not." Congo was "very agitated," and Hall had "a fairly deep gaping wound" on the side of his face.

Under these circumstances, the police officers were justified in conducting "not only a search of the premises to find people in need of aid, but also a protective sweep to ensure that no further danger [wa]s present."[21] Other courts have held that a 911 hang-up call, alone, may provide grounds for a protective sweep of the premises from which the call originated.[22]

---

The Superior Court's finding is supported by the officers' testimony. Officer Smack: "All I know is that I heard a female voice at the door, a female voice at the far side of the residence that was screaming, and then next, the next sequence of events was that they were both at the door."; Officer Mancuso: "At that point there was so much going on, and Officer Smack and Officer Clarke weren't able to check the residence to make sure anyone else was inside it, due to it being a 911 hang-up call we weren't sure if there was anyone else involved, you could hear dogs barking, weren't sure if they were barking at someone.".

19. *See Blake v. State,* 954 A.2d at 317–18 (quoting *Guererri v. State,* 922 A.2d at 406).

20. *Guererri v. State,* 922 A.2d at 406 (citations omitted).

21. *Id.* at 407 (citing *Mincey v. Arizona,* 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978)). *See also Tierney v. Davidson,* 133 F.3d 189, 197–99 (2d Cir.1998). In *Guererri,*

we found the case of *Tierney v. Davidson,* to be persuasive. In *Tierney,* the Second Circuit analyzed facts that are similar to those that are extant in Hall's case. In *Tierney,* police officers were dispatched to a "bad" domestic dispute, and conducted a limited search of the residence. *Id.* at 193. Under the specific facts of that case, the Second Circuit concluded that "[i]t was objectively reasonable for [the officer] to believe that a limited search of the premises to locate the other person involved in the dispute was necessary to ensure the safety of the people on the premises...." *Id.* at 199.

22. *See State v. Frankel,* 179 N.J. 586, 847 A.2d 561, 574 (2004) ("The responding police officer is not required to accept blindly the explanation for the 9-1-1 call offered by the resident answering the door, but must base his decision on the totality of the circumstances. Courts are loath to second-guess decisions made in good faith with the intent of protecting life when the circumstances clearly reveal a legitimate emergency that will not abide

Accordingly, we hold the Superior Court properly applied part three of the *Guererri* test.

Finally, Hall argues that the Superior Court abused its discretion and made clearly erroneous findings by relying on facts that were not in evidence. Specifically, Hall argues that because "[t]here was no testimony that the reason for the search was to check the stove, backdoor or dogs," the Superior Court erred in relying on those facts. The Superior Court did not rely on those facts in its decision. In its supplemental letter, the Superior Court explained that "those concerns were not articulated by the officers who testified, [but] they bring into more specific relief the reason why a sweep makes sense under the circumstances." The basis for the Superior Court's ruling, however, was that the police officers were "justified in conducting a limited sweep to make certain no one else, especially another injured adult or child, was left behind."

### Conclusion

The judgments of the Superior Court are affirmed.

delay."); *State v. Pearson–Anderson*, 136 Idaho 847, 41 P.3d 275, 279 (App.2001) ("In the case of a 911 hang-up call, there is a heavy governmental interest in assuring that the danger or distress which prompted the call has been discovered and resolved by responding officers.").