**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| **STATE OF DELAWARE,** | ) | |
| | ) | |
| v. | ) | **I.D. No.: 2410001810** |
| | ) | **2410003789** |
| **MICHAEL MACE,** | ) | |
| | ) | |
| Defendant. | ) | |

*Submitted:* April 4, 2025
*Decided:* April 9, 2025

### Amended OPINION AND ORDER

*Upon Consideration of Defendant's Motion to Suppress,*

### GRANTED

*Christina Davis*, *Esquire*, Deputy Attorney General, Delaware Department of Justice, 820 N. French Street, 7th Floor, Wilmington, Delaware, *Attorney for the State*.

*Matthew Keating*, *Esquire*, Assistant Public Defender, State Office Building, 820 N. French Street, 3rd Floor, Wilmington, Delaware, *Attorney for the Defendant*.

**JONES, J.**

## INTRODUCTION

On October 8, 2024, because of a 911 call and subsequent arrest, Wilmington Police Department Officer Logan Crumlish seized a firearm that was near the Defendant. Defendant was charged with Possession of Firearm by a Person Prohibited. As a result of the seizure of the firearm, Defendant was charged with a second set of charges related to a different event. On March 4, 2025, Defendant filed this instant Motion to Suppress. The State filed its response on March 20, 2025. A hearing was held on April 4, 2025 where Officer Crumlish testified. This is the Court's decision on that Motion.

## FACTS

Based on the testimony at the hearing, which included the testimony of Crumlish and two body worn cameras, I find that the state has proven the following by a preponderance of the evidence.

In the early morning hours of October 8, 2024, at approximately 12:30 a.m., Officer Crumlish and several other members of the Wilmington Police Department ("WPD")—at least six in total—were dispatched to 411 North Clayton Street in Wilmington, Delaware, following a 911 call. According to the information relayed, a child had reported that his mother was being threatened with a firearm by either his father or his mother's boyfriend.[1]

---

[1] Docket Item ("D.I") at Defendant, at 1.

Upon arriving at the residence, Officer Crumlish knocked on the front door and looked through a window, where he observed a tall white man behind the couch.[2] After two knocks, a woman answered the door stating that only she and her children were present inside.[3] Officer Crumlish advised her that he had seen a man in the home, directed her to exit the residence, and informed her that officers would be conducting a search of the residence to ensure their safety.[4] Although the woman stated that the officers were not permitted to enter, they proceeded inside and instructed her and the children to remain on the front porch.[5]

While searching the residence, officers called out for "Matthew" and announced themselves as law enforcement.[6] During their search, they entered the basement and located Michael Mace standing behind the basement steps.[7] Officer Crumlish arrested Mace, conducted a search incident to arrest, and escorted him upstairs toward the exit.[8]

There is a factual dispute as to what happened next. The State contends that, while walking back up the stairs, Officers observed a black firearm on the floor.[9] According to Crumlish, it was located under a large TV box that was leaning against

---

[2] D.I. 7 ¶1.
[3] D.I. 7 ¶2.
[4] D.I. 6 p.2; 7 ¶3.
[5] D.I. 6 p.2.
[6] *Id.*
[7] D.I. 7 at 3.
[8] D.I. 6 p.2.
[9] D.I. 7 ¶3.

the wall. Crumlish testified that he could see the firearm under the box as the box was leaning against the wall and there was a visible space between the wall and the box. Defendant takes issue with what Crumlish could see. The Defendant claims that while standing in front of the stairs, Crumlish stopped and pushed an empty TV box that was leaning against a wall, exposing a handgun on the floor, under where the box had been.[10]

The Defendant was transported to WPD headquarters, where he was processed in connection with case number 2410001810,[11] as well as a separate pending fire-arm related case, identified as case number 2410003789.[12]

On January 7, 2025, Defendant was indicted by a New Castle County Grand Jury for both incidents.[13] He filed this Motion to Suppress on March 4, 2025.[14]

## CONTENTIONS

Defendant seeks to suppress the seizure of the Defendant's firearm on the basis that the officers' searches and seizures exceeded the scope of the Emergency Doctrine and Defendant's arrest was premature, rendering all fruits of the poisonous tree inadmissible.[15] The State contends Defendant's firearm was lawfully obtained

---

[10] D.I. 6 p.2-3.
[11] *Id.*
[12] D.I. 7 p.3.
[13] D.I. 7 ¶8.
[14] *Id.*
[15] D.I. 6 p.7.

in plain view to the officers while conducting a protective sweep under the emergency doctrine requirements.

## STANDARD OF REVIEW

On a motion to suppress, the burden of proof is on the State to show by a preponderance of the evidence that the contested evidence was not obtained as the product of an illegal search and seizure.[16]

## ANALYSIS

The Fourth Amendment of the United States Constitution and Article I, §6 of the Delaware Constitution shields an individual's right from unreasonable searches and seizures.[17] As a general rule, warrantless searches are considered unreasonable.[18] However, specific exceptions exist that permit officers to conduct searches without a warrant under certain circumstances.[19]

## EMERGENCY DOCTRINE

"One of those limited circumstances is a warrantless search of a house after the occurrence of a violent crime when it is reasonable to believe that dangerous people or victims are on the premises-the so-called 'emergency exception' doctrine."[20] A warrantless entry and subsequent search of a person's home does not

---

[16] *State v.* Barrett, 2019 WL 5110126, at *2 (Del. Super. Oct. 11, 2019).
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *Hall v. State*, 14 A.3d 512, 515 (Del. 2011).

violate the Fourth Amendment under the emergency doctrine if the State proves by a preponderance of the evidence that:

> (1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property. (2) The search must not be primarily motivated by intent to arrest and seize evidence; (3) there must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched.[21]

The first prong of the emergency doctrine is clearly satisfied as officers had reasonable grounds to believe an immediate threat to life or property existed.[22] A juvenile reported that their mother was being threatened with a firearm, and upon arrival at 411 N. Clayton St., Officer Crumlish saw children and a male inside. When an adult female answered the door, she denied the male's presence despite officers having seen him hidden behind a couch. Given the reported armed threat, the presence of children, and the woman's uncooperative and untruthful response, officers reasonably believed an emergency was at hand, justifying their warrantless entry.

The second prong of the emergency doctrine is also satisfied, as the officers' primary motivation was not to arrest or seize evidence but to ensure safety. Under this prong, "officers must conduct the search primarily to achieve a community caretaking function, rather than to pursue a law enforcement objective."[23] Here,

---

[21] *Guererri v. State*, 922 A.2d 403, 406 (Del. 2007).
[22] *Id.*
[23] *Id.* at 407.

given officers' limited information of the circumstance, officers had reason to believe an ongoing threat remained. Officers conducted the search "to ensure that there was not an ongoing emergency threatening the protection of life or property,"[24] fulfilling the requirements of prong two.

The third prong of the emergency doctrine is also satisfied, as there was a "reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched."[25] To meet this prong, "there must be a direct relationship between the area to be searched and the emergency."[26] In addition, "[t]he search may include not only a search of the premises to find people in need of aid, but also a protective sweep to ensure that no further danger is present."[27] Here, officers did not know the location of the male who was reported to have a firearm. Officer Crumlish first observed him standing behind the couch, but by the time officers entered, he was no longer in that spot. Given this uncertainty, officers conducted a protective sweep to locate the Defendant and ensure no further danger was present.

Therefore, the criteria of the emergency doctrine are fulfilled, allowing for the warrantless entry into the residence without violating the Fourth Amendment.

---

[24] *Id.* at 406.
[25] *Id.*
[26] *Id.* at 407.
[27] *Id.*

The Defendant further argues that he was arrested and handcuffed prematurely, and as a result, all evidence obtained should be suppressed under the fruit of the poisonous tree doctrine. However, the decision to use handcuffs depends on the totality of the circumstances, which can rapidly evolve.[28] Therefore, "officers may take measures reasonably necessary to protect themselves and maintain the status quo."[29] Even so, "officers should use the least restrictive means of detention reasonably necessary to achieve the purpose of the detention."[30] In this case, the officers were operating with limited information—that a male in the house was armed and making threats. At the time they encountered the Defendant, they were unaware whether he was carrying a firearm or if it was loaded. Given these unknowns, it was reasonable and necessary for the officers to take precautionary measures to ensure their safety and the safety of others by placing the Defendant in handcuffs in order to search him.

## PLAIN VIEW EXCEPTION TO A WARRANTLESS SEARCH

The State argues that the gun was discovered on the floor, in plain view of the officers, following the Defendant's arrest. However, the Defendant contends that Officer Crumlish purposely kicked over a TV box which exposed a handgun on the floor. The seizure of contraband in plain view is permissible, as "the mere

---

[28] *Womack v. State*, 296 A. 3d 882, 891 (Del. 2023).
[29] *Id.* at 891-92.
[30] *Id.* at 892.

observation of an item in plain view does not constitute a Fourth Amendment search."[31] However, if the contraband is not in plain view, it is not permitted under a warrantless search.

Upon my review of the body-worn camera footage of both Officer Crumlish and Officer Rennewanz, it appears to the Court that, due to the position of the TV box against the wall, there is a shadow that makes it impossible to see the firearm without having to first move the TV box. In addition, neither the body-worn footage, nor Officer Crumlish's hearing testimony, indicate that Officer Crumlish attempted to use his flashlight to search the shadowed area before knocking over the box. The Court finds the firearm was not in plain view with the TV box in the way. Therefore the plain view doctrine does not apply and the officers had no basis to seize and search the firearm.

## CONCLUSION

Based on the above reasons, Defendants' Motion to Suppress is **GRANTED.**

**IT IS SO ORDERED.**

*/s/ Francis J. Jones, Jr.*
Francis J. Jones, Jr., Judge

cc: *File&ServeXpress*
Christina Davis, Deputy Attorney General
Matthew Keating, Assistant Public Defender

---

[31] *State v. Swiggett*, 2019 WL 245292, at *3 (quoting *Hardin v. State*, 844 A.2d 982, 985 (Del. 2004)).