VALIHURA, Justice,
dissenting:
The Board of Caris, as the “Administrator” of the Company’s 2007 Stock Incentive Plan (the “Plan”), was required to make two determinations. The first was to determine the fair market value (“FMV”) of the common stock of the Company. The second determination was to make certain capitalization adjustments in connection with a spin-off of two of the Company’s business units. The Court of Chancery, in my view, erred in finding that the Board breached these contractual obligations. Accordingly, I respectfully dissent.
I. STANDARD OF REVIEW
Determining whether a party has breached a contractual duty of good faith requires a court to reach a legal conclusion. This Court reviews a trial court’s legal conclusions de novo.[7] This Court will uphold the Court of Chancery’s factual findings so long as they are not clearly erroneous.[8] The clearly erroneous standard applies to factual determinations based on credibility and the evidence.[9] *1043 This Court also has the authority to review the entire record and reject the trial court’s findings if they are not supported by the record or are not the product of a logical and orderly deductive process.[10] Here, certain of the Court of Chancery’s findings, in my view, fail to satisfy that test.
The plaintiff, Fox, was required to prove that the Board breached its contractual duty of subjective good faith either by demonstrating that the Board acted in subjective bad faith or by showing that it consciously disregarded a known duty to act.[11] With respect to subjective bad faith, Fox was required to prove that a majority of the Board did not subjectively believe in the FMV it determined. If Fox proceeded under a conscious disregard theory, he would have been required to prove that a majority of the Board intentionally failed to form a subjective belief as to FMV in the face of a known duty to act. I do not believe the record supports either conclusion.
As to the first test, the Court of Chancery made no factual findings supporting the conclusion that a majority of the Board acted in bad faith. That is because the trial court concluded that the Board did not act — a conclusion with which I disagree. Because the court never made the Board-related bad faith findings required by the Plan, this Court is left only with incomplete factual findings to which we cannot properly defer.[12] The trial court then erroneously applied a good- faith test solely to the actions and beliefs of Martino and Halbert, analyzing whether they acted in good faith.[13] If the trial court believed that the Board had not acted, then it should have .proceeded, to analyze whether a majority of the Board intentionally failed to act in the face of a known duty to act. This typically requires an extraordinary set of facts. ■ Such facts, as to the Board’s conduct, are not present here.
The trial court’s conclusions, in my view, are not entitled to deference for another reason. The Court of Chancery implicitly rejects the trial testimony of the directors in passages that refer to unidentified “de *1044 fense -witnesses” based upon a “hindsight bias” theory it derived from certain psychological literature. The. court concludes in this regard:
At trial,..the defense witnesses testified differently. Except for Martino and Halbert, the defense witnesses seemed honestly to believe when testifying that they thought TargetNow and Carisome had very little value in fall 2011.[14] In my view, this was a product of hindsight bias. “Hindsight bias has been defined in the psychological literature as the tendency for people with outcome knowledge to believe falsely that they would have predicted the'reported outcome of an event.”[15]
In my view, this Court should be skeptical of court rulings predicated upon social science studies, particularly where, as here, such theories impact a trial court’s own post-trial impressions of the testimony offered,[16] Such skepticism seems appropriate in this case, since immediately after trial the Court of Chancery stated that “the credibility of the people on the [B]oard who made these decisions” was “very, very strong.!’[17] For example, the trial court had the following “reactions”[18] after the three-day trial:
So for the defendants, I think what’s very, very strong is the contractual standard, assuming the good faith standard is, indeed, the operative standard, and the credibility of the people on the Board who made these decisions.[19] * ⅛ #
And PwC, you know, I think there’s problems with PwC’s work. I think there’s serious problems with Grant Thornton’s work. So since I think the defendant’s position on the good faith issue and the good faith of the people involved is, I think, as I said, quite strong, I’m going to dilate a little bit more on the PwC and Grant Thornton things.[20] :
* * #
This is one of these troubling things where the people at the top seem to have tried to proceed in the correct manner.[21]
⅜ * *
I don’t think it would be helpful — as I said, you can present your case [in post-trial briefing] however you want. I don’t think it would be helpful to make *1045 the argument that these folks intentionally tried to harm their option holders'. Having seen the people here, it’s very hard for me to think that’s what they did. Maybe if you put’it all together and line everything up, that will be what you try to convince me of. I have a lot of trouble thinking that’s actually what went on.[22]
Admittedly, there are some comments that tilt the other way, but they are primarily focused on the advisors’ analyses, and none seem genuinely to discredit the directors’ testimony or the trial court’s impressions that the Board had acted in good faith. I recognize that the trial court’s post-trial comments may have been designed to direct the parties to focus on certain issues for purposes of post-trial briefing and perhaps to encourage the parties to settle. That' kind of guidance is helpful to the litigation process. But even so, I credit the Court of Chancery’s comments as being an accurate and sincere account of its impressions of the trial testimony. The subsequent implicit discrediting of the directors’ testimony in the Opinion, based apparently and solely on its hindsight bias theory,' strains, to the point of breaking, my strong desire and inclination to exercise judicial restraint in the area of deference to trial court fact-finding. As such, the court’s post-trial statements contribute to my conclusion that the Court of Chancery’s ultimate findings are logically disconnected from the record evidence before it, from the trial court’s own immediate, on-the-record impressions of the trial, and from the requirements of the legal test established by the Plan.
Employing its hindsight bias theory, the trial court found that unspecified “defense witnesses” did not subjectively believe in a low valuation in late 2011. In support of this conclusion, the court relied upon “contemporaneous” evidencé that appears to consist of indications of interest from potential bidders for TargetNow, Grant Thornton’s pre-transaction valuations,[23] and evidence, “from the files of JH Whitney.” [24] The trial court also referenced eer- *1046 tain emails sent in the lead-up to the close of the Miraca transaction. The communications reflect Halbert and Johansen’s optimism with respect to the potential value of SpinCo, but do not amount to Board approval of valuations hundreds of millions of dollars in excess of Prieewaterhouse-Coopers’ (“PwC”) $65 million valuation.[25] The trial court focused on the subjective beliefs of Martino, the Company’s CFO and COO, who was not a member of the Board. While it is true that live determinations of credibility are entitled to deference from this Court, the trial court’s live determinations in this case support a finding that the directors’ testimony is credible. And it appears the Court of Chancery’s hindsight bias theory overrode those conclusions.
Because the Court of Chancery held that the Board did not act to determine FMV, it did not find that a majority of the directors acted in bad faith in making that determination. Nor did it find that the Board consciously disregarded a known duty to act. Further, knowledge of bad faith cannot be imputed from an executive or even from a director to the entire Board on the basis of this record.[26] Accordingly, I would reverse the judgment of the Court of Chancery on this basis.
II. THE BOARD’S ACTIONS AND SUBJECTIVE BELIEFS
A. The Terms of the Plan and Merger Agreement
A brief review of certain features of the transaction and related documents are important in explaining my conclusion that the Board acted in satisfaction of the Plan’s requirements. In 2011, Caris transferred ownership of Carisome and TargetNow to a new subsidiary. That subsidiary was then spun off to the Com- *1047 pan/s stockholders. Thereafter, Caris owned only a third business unit, Caris Diagnostics (the “AP Business”), and merged with a wholly owned subsidiary of Miraca. In the merger, Miraca paid $725 million for what remained of Caris after TargetNow and Carisome were spun off. Each share of RemainCo stock was converted into the right to receive $4.46 in cash. Option holders were to receive the difference between $5.07 per share and the exercise price of their options, minus 8% that would be placed into an escrow account contemplated by the Agreement and Plan of Merger with Miraca (the “Merger Agreement”). Of the $5.07, $0.61 was attributed to the spun-off entity. Carls’ $5.07 option price was driven by the $725 million merger price and PwC’s $65 million valuation of SpinCo.
The Plan provides that each option holder is entitled to receive for each share covered by an option the amount by which the FMV of the share exceeds the exercise price. As defined by Section 2.25 of the Plan, FMV is “the value of the Common Stock as determined in good faith by the Administrator....”[27] The Plan does not define “good faith.” Further, Section 3.B of the Plan affords the Administrator the broad discretion “to make any and all other determinations which it determines to be necessary or advisable for administration of the Plan.”[28] Under Section 3.4 of the Plan, “[a]ll decisions made by the Administrator” pursuant to the provisions of the Plan are “final and binding on the Company and [participants in the Plan], unless such decisions are determined to be arbitrary and capricious.”
Section 12.3 of the Plan states that the Company, “to the extent permitted by applicable law, but otherwise in the sole discretion of the Administrator,” may provide for the cancellation of outstanding options in exchange for “the difference between the Fair Market Value and the exercise price for all shares of Common Stock subject to exercise (i.e., to the extent vested) under any outstanding Option[.]”[29] Section 12.1 of the Plan requires that the Board, as Administrator, make capitalization adjustments in connection with the spin-off of the TargetNow and Carisome business units. Specifically, the Plan mandates that the Board account for the spinoff by adjusting the exercise price of the options “to reflect any increase or decrease in the number of issued shares of Common Stock, or change in the Fair Market Value of such Common Stock resulting from such transaction....”[30]
The Merger Agreement contemplates the Board actions required by the Plan, as well. Section 2.11(a) provides: “Effective as of immediately prior to the Closing, the Company shall take all necessary actions pursuant to the [ ] Plan (and the underlying option grant agreements)[31] Fur *1048 ther, Section 2.11(b) provides that “[t]he [ ] Plan shall terminate as of the Effective Time, and no holder of Company -Options issued pursuant to the [] Plan or any participant in the [] Plan shall have any rights thereunder....”[32] The “Effective Time,” as defined by the . Merger Agreement, is the time that the Certificate of Merger is accepted for filing by the Secretary of State or a later date specified in the Certificate of Merger and agreed upon by the parties to the transaction. In this case, it was November 22, 2011.
B. The Board Determined Fair Market Value
The following facts suggest to me that the Board did determine the FMV of the stock. I observe preliminarily that at trial, Johansen, who served as President of Caris Diagnostics and Vice Chairman of the Board, testified that, “under the terms of the [ ] [P]lan, the [BJoard is required to use good faith in determining fair market value.”[33] She stated that the Board visited with legal counsel “to understand how [it] discharged [its] duty of good faith in determining fair market value.”[34] The Company’s legal counsel recommended that the Board “hire an independent advis- or” to assist the directors in determining FMV.[35] “And that’s what [the Board] did[ ] to determine fair market value,” according to Johansen.[36]
1. The October 5 Board Meeting
On October 5, 2011, the Board held a telephonic meeting. All members of the Board were present. Also present at the meeting were Citi, PwC, legal counsel, and other Company executives. The meeting was convened to consider the Merger Agreement and a spin-off of the Target-Now and Carisome business units. During the meeting, Citi made a presentation to the Board concerning the equity waterfall mechanics that would be used to effect the adjustment of the options mandated by the Plan as a result of the spin-off.[37]
According to the October 5 minutes, PwC presented the valuation of the Tar-getNow and Carisome business assets to the Board. “[PwC] discussed the Target-Now, Carisome and intangibles valuations.” [38] Prior to the meeting, the Corn- *1049 pany’s chief legal officer distributed what he identified to the Board as PwC’s “valuation of SpinCo.”[39] PwC also provided the Board with * a draft valuation memorandum, the subject of which was: “Valuation analysis of certain trademarks, assets, and businesses of Caris Life Sciences.”[40] The memorandum provides that the Company “engaged PwC to perform a valuation analysis of; [sic ] 1. Caris US’ TargetNow business (‘TN Business’); 2. Caris US’ Carisome business (‘Carisome Business’); 3. The ‘Caris Life Sciences,’ ‘Caris,’ ‘Caris-Path,’ ‘CarisDiagnostics,’ and ‘Pathology Partners’ trademarks (‘Trademarks’); and 4. Other intangible assets (‘Other Assets’) used in the operation of the anatomic -pathology business (‘AP Business’), TN Business, and Carisome Business.”[41] With- respect to PwC’s valuation of TargetNow, the memorandum provided: “Based upon this analysis, PwC determined a final carrying value of USD 47,23 million for the whole of the TN Business.”[42] As to PwC’s valuation of Carisome, the memorandum set forth: “Based on this analysis, PwC determined a final value for the .Carisome Business of USD 17.79 million.”[43] At the October 5 meeting, the uncontroverted record is that PwC reviewed its valuations with the Board, and the Board authorized a final transaction based upon those valuations.[44]
On the basis of the $65 million valuation provided by PwC and the additional information provided by Citi, the Board held an executive session at the October 5, 2011 meeting during which it “voted and unanimously approved and adopted” resolutions that authorized the Merger Agreement and the , Separation and Distribution Agreement (the “Separation Agreement”). The October 5 resolutions also provided the following recital:
WHEREAS, pursuant to Section 12.1 of the Corporation’s 2007 Stock Incentive Plan (the “Corporation Stock Plan”) and the underlying option grant agreements, subject to the consummation of the Distribution and prior to the consummation of the Merger, the Corporation shall proportionately adjust each outstanding option to purchase shares of the Corporation’s common stock (the “Options”) to take into account the Distribution, - provided, however, that any fractional shares resulting from the adjustment shall be eliminated[.][45]
The Board resolved “that, subject to the consummation of the Distribution, the ex *1050 ercise price of each Option shall be proportionately adjusted to take intcj account the Distribution... .”[46]
On November 22, the Board authorized the cancellation of the options with the understanding that the PwC fair market valuation would be used. Johansen’s testimony supports this conclusion. She testified as follows:
A. This is [sic] unanimous consent of our [B]oard signed at the time of closing of the transaction.
Q. And what did the written consent accomplish?
A. This approved the distributions contemplated by the [Separation [A]greement where we issued the new stock to the existing stockholders as well as the adjustments to that option, the option plan.
Q. How did the [B]oard value Target-Now and Carisome in connection with the spin-off and the cash-out of the options?
A. So under the terms of the incentive plan, the [B]oard is required to use good faith in determining fair market value. And at that time, there was a lot going on, but we were working with Shearman <& Sterling for all of the transaction. And we visited with them about trying to understand how we discharged our duty of good faith in determining fair market value.
And their recommendation, which we agreed with, was that we should hire an independent evaluation, to find an expert who had experience in evaluating these very difficult-to-evaluate or early-stage venture-backed companies that had significant losses and mounting loses like we had with TargetNow, or Cari-some, which was just an experimental idea that we hoped might someday have value.
So they recommended that we hire an independent advisor, and we agreed, of course, that made sense. And that’s what we did[ ] to determine fair market value. We relied on the report of the experts.
There is no finding by the trial court as to why Johansen’s testimony is not credible.[47] Based on the $725 million purchase price for the AP Business representing $4.46 per share and the $65 million valuation for SpinCo representing $0.61 per share, the FMV of each option was $5.07.[48] Thus, the Board-confirmed the determination of FMV by written consent on November 22, 2011.
2. The Board Was Entitled to Rely on PwC’s Valuation
The trial court took issue with Caris’ reliance on the PwC valuation, finding that *1051 it was a transfer tax valuation instead of a fair market valuation.[49] But at trial, Hal-bert, the Chairman and CEO of Caris, testified that PwC was engaged “to get to a fair market value, arm’s — what an arm’s-length third-party would pay for the asset— ”[50] He stated that he “understood” from PwC’s October 5, 2011 presentation that “they were doing a fair market value”[51] and that they were providing the Board with valuations of the TargetNow and Carisome businesses.[52] According to Halbert, the original report he received from PwC maintained a cover sheet that said “fair market value of the business enterprise.”[53] The Caris Chairman and CEO also testified that, on October 5, the Board “believed it to be that [PwC was] attempting to provide a fair market value number valuation for the [TargetNow and Carisome] businesses in an arm’s-length way.”[54] When asked whether his understanding ever changed, Halbert said, “No.”[55]
Similarly, Johansen and Knowles both testified at trial that they understood PwC to be providing the Board with an FMV for TargetNow and Carisome. According to Johansen, the Board asked PwC to provide it with “a fair market value analysis because we needed to have one done under the stock option plan. So they were — that is what I understood them to be providing to the [B]oard.”[56] When asked whether the Board “ever discussfed] the fair market value of Caris at the time the options were repurchased,” Knowles testified that the Board “did discuss the [PwC] — I think it was [PwC] who did a valuation.”[57]
As to the Board’s good faith reliance on the PwC valuation and what they were told, the Court of Chancery commented as follows at the conclusion of trial:
... I do think PwC did a tax-style intellectual property valuation. The standard of fair market value may be the same, but when valuation professionals approach these things, they do things with different mindsets.
[[Image here]]
There’s very striking changes between what the [B]oard was told that PwC was doing, ie., valuing the [C]ompany, and what PwC then actually said it did in its final, which was valuing the assets, and what PwC’s methodologies of analysis demonstrated it did, which was value the assets in the same way that they had previously done transfer tax valuations.
That’s very good for the [B ]oard in terms of the [B board’s good faith. It’s very hard when the [B ]oard is told something to think that the members of the [B ]oard or, here, the [P ]lan administrators, acted in bad faith when they *1052 were told by PwC that we’re doing something that they really didn’t do,[58]
Boards are permitted to consult with financial advisors whén determining a company’s valué. Here, the directors also unquestionably relied, upon their own. views of the Company’s value. There are no findings by the trial court that a majority of the Board knew of any flaws in PwC’s or Grant Thornton’s analyses,[59] Nor are there any findings that' the directors acted in bad faith in relying, to the extent that they did, on PwC.
3. The Board’s Views on the Value of SpinCo
Each of the directors who were asked about PwC’s valuation at trial testified that it was optimistic. Carisome and Target-Now encountered significant difficulties in developing effective products. With respect to' TargetNow in particular, Halbert testified that it was losing between 2 and $4 million a month,[60] While the Company was nonetheless “hopeful” that it might be able to obtain “a big number” in a sale of the TargetNow business,[61] Halbert testified that “we would have sold at basically any price” and that the Company was not “price sensitive,”[62] With respect to Cari-some, Halbert testified that the Company would have sold the business unit “at a certain price, for sure. It was just you don’t have anything marketable. So why would somebody buy it? So they would buy it for some unknown reason and it would'have to be a very low -price. So there’s no reason to sell it because it would be very, very cheap.”[63] Halbert testified that, in 2011, he preferred to “roll the dice and keep going and see if we can make something out of [Carisome]. . That’s why I wouldn’t sell at that time.”[64] Further, he stated that, in 2011, the Company was “[h]opeful” that Carisome would develop a marketable product, but that it “couldn’t get anything to work. So if nothing was working, it was a difficult timé from that standpoint.”[65] . The absence of a Carisome product, Halbert testified, “was the challenge for the valuation.”[66]
Directors Knowles, Johansen, and Cas-tleman, each testified at trial that PwC’s fair market valuation was in line with or higher than their subjective beliefs as to the value of SpinCo. Knowles testified that the valuations for the TargetNow and Carisome businesses presented by PwC to the Board on October 5, 2011 were both high,[67] As to TargetNow, Knowles stated *1053 that PwC’s $47.23 million valuation was “high” because ■ of “the very substantial investment that would be required to make it a seriously profitable product.”[68] Further, when asked whether he viewed PwC’s $17.79 million valuation of the Cari-some business to be reasonable, Knowles testified that, in “light of the data, both at that time clinical and preclinical, I think this is too high.”[69] Knowles stated that, in making a valuation determination, it was necessary to “bear in mind” that there was “a substantial proportion of even research people who didn’t believe that this approach would give viable diagnostics_ This is absolutely cutting-edge .science. You know, that’s not usually, worth a lot until you have clinical data.”[70]
At trial, Johansen testified that oncologists were “resistant” to’the TargetNow product and that insurance companies “didn’t want to pay for it.”[71] Accordingly, Johansen stated that, in 2011, “TargetNow was still losing money, and losses seemed to be accelerating as opposed to narrowing.” [72] She observed that “there was no minimum price [for TargetNow]. I think for a lot of us on the [B]oard, we felt that just getting it off of our books, because it was losing money, just — we would be willing just to almost give it away because — or even shut it down, because it was not — it was a highly complex and distracting business that was losing money.and mounting losses.”[73] As to Carisome, Johansen testified at trial that the company “was just an experimental idea that we hoped might someday have value.”[74] According to Jo-hansen, in 2011, Carisome “was just basically an experiment ... or series of mini-experiments, but there was no product offering. There was nothing really there more than a hope that, someday,, we might have a successful offering, but there was nothing really to sell.”[75] Ultimately, Jo-hansen testified that PwC’s valuation conclusions for TargetNow and Carisome “were very fair, that they were fair on the side of being generous because of the. losses that we had in TargetNow and the state of the Carisome research.”[76]
Castleman’s views • of TargetNow and Carisome were less optimistic than those of Halbert, Knowles, and Johansen.[77] At *1054 trial, Castleman testified that his view, in 2011, “was you shut Target[Now] down and you fire everyone in Carisome except for ten R & D people, and you run this as an R & D company.... But make it what it is, which is an R & D company, instead of combining those two companies, which were, again, bleeding 60, $70 million a year of cash.”[78] As to TargetNow specifically, Castleman reiterated that he believed it “should be shut down.”[79] He testified as follows: “I thought it was a losing company. I still believe that. It’s still in the same position it was four years ago, and it would be a dreadful IPO.”[80] Castleman also testified that he did not view Cari-some to be “highly valuable” in 2011, observing that the company “did not have a product.”[81] He stated that he believed that Carisome was “potentially highly valuable,” but that he did not “agree that it was a highly valuable business” in 2011.[82]
Where a board is subject to a contractual obligation to make a determination in “good faith” and the contract does not define good faith, the “determination will be considered to be in good faith unless” it “went ‘so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.’ ”[83] This is a purely subjective standard. In its Opinion, the trial court dismissed the independent directors’ testimony and beliefs as to valuation based not on any express negative credibility determinations, but on its hindsight bias theory. This implicit rejection stands in stark contrast to its own post-trial reflections, where it stated:
I almost, ironically, think the [B]oard would be infinitely better off had they never hired Grant Thornton or PwC and just made the type of judgmental assessment like they testified to on the stand. Because, obviously, this was a tough company to value. There is no question about that, and I’m very sympathetic to that.[84]
For me, the trial court’s blanket rejection of thoughtful and consistent testimony by *1055 directors who were sequestered during trial does not logically follow from the evidence or from the court’s own favorable post-trial impressions of the directors’ testimony.
Further, instead of focusing on the subjective beliefs of the directors accused of wrongful conduct, the Court of Chancery’s credibility findings centered on Martino, Halbert, PwC, and Grant Thornton. I believe this is also problematic, since there is no basis to attribute their conduct to the whole of the Board. Indeed, the court found that neither Martino nor Halbert were acting as the Board’s agents.[85] Ultimately, the Board’s determination of FMV was not so far beyond the bounds of reason as to be inexplicable on any ground other, than bad faith.
C. The Board Determined the Adjustment
Nor do I believe that the record supports the conclusion that the Board breached the Plan as to the required adjustment. The Plan required the Administrator to proportionately adjust the exercise price of the options to reflect the change in the FMV of the Company’s common stock as a result of the spin-off of TargetNow and Carisome.[86] Because the Plan granted participants options to purchase Caris stock, both the number of shares underlying a participant’s award and the exercise price were adjusted. As explained by the Company, by dividing the implied residual equity value of pre-spin-off Caris by the implied equity value of the merger consideration, the adjustment factor was calculated to be 1.137.[87] The strike price for the options was then divided by 1.137, and the number of issued and outstanding options was multiplied by 1.137.[88] Accordingly, the strike price for the options was reduced and the number of options issued and outstanding prior to the Effective Time was deemed to be increased, although the additional options “were not actually issued since all options were cancelled and the Plan [was] terminated at the Effective Time.”[89] The adjustment ensured that the option holders received a payout that included the value of SpinCo.
In accordance with Section 2.09 of the Merger Agreement, on November 18, 2011, the Company delivered to Miraca a good faith estimate of the purchase price in connection with the merger (the “Estimated Purchase Price”). The Merger Agreement also required that the Company, no later than three business days prior to the closing, “prepare and deliver to [Miraca] a schedule setting forth the respective amounts of the consideration payable at the Closing to each holder of Company Equity Securities” on a holder-by-holder basis (the “Closing Consideration Schedule”).[90] The Company also delivered an Officer’s Certificate, dated November 16, 2011, executed on behalf of Caris by Martino, certifying that the Estimated *1056 Purchase Price and the Closing Consideration Schedule were calculated in good faith.[91] Specifically, the Officer’s Certificate states that, “[t]he undersigned hereby certifies that, as of the date hereof, the information set forth in the Estimated Purchase Price and the Closing Consideration Schedule was calculated in good faith in accordance with the Merger Agreement and the Governing Documents of the Company.”[92] It states further that Martino executed it “on behalf of the Company and not in his personal capacity.”
On November 22, 2011, the Board entered into a Unanimous Written Consent pursuant to 8 Del. C. § 141(f) (the “Consent”).[93] The Consent reflects that Caris entered into the Merger Agreement, dated as of October 6, 2011, with Miraca and that, as a condition of the merger, Caris entered into a Separation Agreement, dated as of November 16, 2011, with wholly owned subsidiaries of the Company.[94] The recitals state that the Board desired to declare the payment of the distribution as contemplated by the Separation Agreement, and as resolved by the Board on October 5, 2011. Pursuant to Section 2.11(b) of the Merger Agreement, the Consent also recites that the Plan would terminate as of the Effective Time of the merger, which was ultimately November 22, 2011. It further recites that pursuant to Section 12.1 of-the Plan, Caris shall take all necessary actions “to proportionately adjust all outstanding Company Options to take into account the Distribution....”[95]
Consistent with these recitals, the Board unanimously consented to the following resolutions:
RESOLVED, that the Board hereby declares the payment of the Distribution as contemplated by the Separation Agreement and as resolved by the Board on October 5,2011;
RESOLVED,, that as of the Effective Time, the [] Plan shall terminate in accordance with its terms and no person shall have any rights under the [ ] Plan thereafter, other than as set forth in the Merger Agreement or by applicable Law;
RESOLVED, that, effective upon, and subject to, the consummation of the Distribution, each Company Option shall be proportionately adjusted in accordance with Section 12,1 of the [ ] Plan and the underlying option grant agreements to take into account the Distribution; provided that any fractional shares resulting from such adjustment shall be eliminated; and
RESOLVED, that all actions taken by the Board or any officer(s) of the Corporation prior to the date hereof, in connection with the transactions contemplated hereby, and in order to effectuate the purpose and intent of the forgoing [sic ] resolutions be, and hereby are, ratified and approved.[96]
I agree with the Court of Chancery’s conclusion that simply because a resolution says something will be done does not make it so. But the evidence in the record shows that, in accordance the mandate of the Board’s resolutions, Caris’ officers and advisors prepared a spreadsheet setting forth the consideration that each option holder would receive after adjusting the options and factoring in the Company’s *1057 complicated, equity structure.[97] Johansen testified at trial that the Board approved an adjustment of the exercise price for the options to take into account the spin-off.[98]
Further, it appears to me that the Court of Chancery’s Opinion is internally inconsistent with respect to its discussion of whether and how the adjustment was determined. The court states that, in combination with an October 6, 2011 discussion of the value of the common stock of the Company, an email exchange between Hal-bert and Martino resolving to utilize the PwC valuation for purposes of the transaction “was the extent of the determination - for both the Fair Market Value of a share of common stock and the adjustment of the stock options for purposes of the [spinoff].” [99] Yet it also,recounts..that “[ajfter trial, Caris was permitted to supplement the record with two additional exhibits.”[100] These submissions were made pursuant to an extended discussion between counsel and the Court of Chancery during post-trial arguments regarding the adjustment that was made. In simultaneous submissions, dated May 5, 2015, the parties further addressed the mechanics of the option adjustment. The trial court found that the Company’s supplemental submission “confirmed that Caris” ,had adjusted the options “as described during; post-trial oral argument.”[101] While the parties may have contributed to the confusion by suggesting that the options had been treated differently in the pre-trial.proceedings, an adjustment, as authorized by the November 22, 2011 Consent, was made by Martino and the Company’s advisors. ■
In view of the foregoing, I believe the evidence demonstrates that the Board, as it was authorized to do pursuant to Section 3.3 of the Plan, delegated the complex computational task of determining the adjustment to the options to Martino and the Company’s advisors.[102] The Board approved these actions in its November 22 unanimous consent. That approval is unquestionably Board action. Although the Court of Chancery concluded that the Board failed to make the adjustment, it nonetheless recognized that Caris “handled the options” by adjusting the exercise price.[103] Sections '3.3 and 3.4 of the Plan gave the Board broad authority in its administration of the contract, and the delegation of the adjustment was within the *1058 Board’s discretion “to make any and all ... determinations which it determines to be necessary or advisable for administration of the Plan” and not “arbitrary and capricious.”[104] The Board, therefore, determined the adjustment in a manner that satisfied its obligations under the Plan.
III. CONCLUSiqN
I believe the Court of Chancery erred, as set forth above. I respectfully dissent.

. Hill Int'l, Inc. v. Opportunity Partners L.P., 119 A.3d 30, 37 (Del.2015) (citing N. River Ins. Co. v. Mine Safety Appliances Co., 105 A.3d 369, 380-81 (Del.2014)).

. Gatz Props., LLC v. Auriga Capital Corp., 59 A.3d 1206, 1212 (Del.2012) (citation omitted).

. Bank of N.Y. Mellon Trust Co., N.A. v. Liberty Media Corp., 29 A.3d 225, 236 (Del.2011).

. Levitt v. Bouvier, 287 A.2d 671, 673 (Del.1972).

. ev3, Inc. v. Lesh, 114 A.3d 527, 539 (Del.2014) (citing DV Realty Advisors LLC v. Policemen’s Annuity & Benefit Fund of Chicago, Ill., 75 A.3d 101, 110 (Del.2013)) ("[A] plaintiff contending that a party did not comply with its express contractual duty of good faith would typically have to show that the party acted in subjective bad faith.” (emphasis in original)); Allen v. Encore Energy Partners, L.P., 72 A.3d 93, 105-06 (Del.2013) (“To plead a breach of the subjective good faith standard under a conscious disregard theory, [the plaintiff must demonstrate that the defendant] consciously disregarded its contractual duty to form a subjective belief. It would take an extraordinary set of facts to do that.”).

. The trial court expressly held that “the Board did not act,” and observed that "the good faith standard arguably does not even apply.” Fox v. CDX Holdings, Inc., 2015 WL 4571398, at *26 (Del. Ch. July 28, 2015). It then assumed that it did apply to Martino and Halbert, stating: "Martino actually made the determination, and Halbert signed off, so this decision analyzes whether they acted in subjective good faith.” Id. Thus, the Court of Chancery's statements — contained in the “Damages” section of its Opinion — about “what the Board would have determined to be the Fair Market Value of a share of Caris common stock in connection with the [m]erg-er, if it had adjusted the options to take into account the Spinoff and made its determination in good faith,” are not findings that the Board acted in subjective bad faith in determining FMV. Id. at *36. Rather, the court’s decision is clear that it found that the Board had failed to act to determine FMVi

.The trial court's discussion of scienter scrutinizes the conduct of Martino and Halbert, as opposed to the subjective beliefs and actions of each of the members of the Board.

, At trial, the plaintiff called Martino, Hal-bert, and an expert, Robert F, Reilly, as witnesses. The defense called directors Laurie Johansen (“Johansen”), Jonathan Knowles ("Knowles”), and Peter M. Castleman ("Cas-tleman”), .Thus, the trial court appears to be referring to the" honest beliefs of three of the four members of the Boárd "who testified at trial,.

. Id: at *3 (quoting Hal R. Arkes & Cindy A. Schipani, Medical Malpractice v. the Business Judgment Rule: Differences in Hindsight Bias, 73 Or. L. Rev. 587, 591 (1994)).

.■ See, e.g., Free v. Peters, 12 F.3d 700, 706 (7th Cir. 1993) (Posner, C.J.) (observing that review of conclusions based on "social scien-tifie or othér data .., is plenary”), cert. denied, 513 U.S. 967, 115 S.Ct. 433, 130 L.Ed.2d 345 (1994); Dunagin v. City of Oxford, Miss., 718 F.2d 738, 748 n.8 (5th Cir. 1983) (subjecting “the ‘fact’ findings of a trial "judge as to the .latest truths "in the social sciences” to the "clearly erroneous standard of review” is “[cjlearly not” appropriate), cert. denied, 467 U.S. 1259, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984).

. A794.

. A793 ("[Tjhese are my reactions from having been here with you all for the last three days.”).

. A794.

. A794-95.

. A805.

. A807.

. The Grant Thornton reports reflecting valuations in excess of those utilized in the transaction had valuation dates ranging from March 2010 through March 2011. See B2; B73; B143; B213; B291. In discussing the value the Board attributed, to TargetNow, the court cited to an internal .PwC email stating that Martino, a non-Board member, "thinks [TargetNow is] worth 150 to 300 M.” B209, Further, the Court of Chancery relied on Citigroup Global Markets ("Citi”) estimates suggesting that the TargetNow business unit was worth. between $195 million and $300 million, in addition to internal documents of J.H. Whitney referencing figures greater than $150 million. See B480; B484. In addition, the contemporaneous evidence generated by Grant Thornton and Citi pre-dated the events that occurred in the summer of 2011. The collective statements of the directors who testified at trial indicated that the value of Spin-Co declined in late 2011- as a result of, among other things, the failed assay, cancelled product trials, and the rejection of the products by doctors and insurance companies, each of which contributed to accelerating losses, downgraded forecasts, and declining revenues. See, e.g., A700-01 (Castleman testimony stating: "By the late summer, the lab, this AP business, generated about 40 million of cash and yet we were down 20 million of cash. So those two businesses alone, for a very short period of time, had eaten 60 million of cash. So..we were going toward a cash crunch and a situation that was not — we were going to run out of money. So we had a bad'situation in that regard,”).

.Fox, 2015 WL 4571398, at *27. There are no findings that any of the Company's directors, other than Halbert, knew of any flaws in PwC's or Grant Thronton’s analyses. Nor • is there any evidence in the record before this Court that the Board, including Castleman, reviewed documents from J.H. Whitney or that the Board ever saw the Grant-Thornton .report used in-the transaction. See A709-10. In fact, Castleman was asked at trial about *1046 the November 3, 2011 J.H. Whitney VI, L.P, Annual Meeting presentation discussed by the trial court and testified that he did not attend that meeting, had no role in the creation of the documents that went to investors in Fund VI, and had not seen the annual meeting document prior to the litigation in this matter. Castleman testified that he "did not think TargetNow could be sold” and that Car-isome was "ten years or 20 years” from commercialization. The trial court rejected this testimony by simply stating, "I credit the contemporaneous documents.” Fox, 2015 WL 4571398, at *27 n.15. Johansen also testified that she was not aware of a price range that was conveyed to J.H. Whitney for the sale of TargetNow. B734. There are no findings as to Dr. George Poste and Stephen Green, two outside directors who never testified.

. See Fox, 2015 WL 4571398, at *27 (noting that "Halbert and other members of management spoke glowingly and optimistically about Carisome's prospects”). Johansen explained her reference to SpinCo as a "juggernaut” by testifying, "I was referring to the fact that if the technology were successful there was big opportunity.” A762. She emphasized that “the big ‘if,’ of course, was we had to prove the technology.” Id. Johansen also stated that the recipients of the email characterizing SpinCo as a juggernaut "all understood kind of the implied ‘if,’ and I didn't go into explaining the email.” A763. The Court of Chancery’s findings also reflect the indeterminate future value of SpinCo. For example, the court concluded that, "although riskier,” the Board thought Carisome was "likely worth more” than TargetNow, "but only if the lottery ticket paid off.” Fox, 2015 WL 4571398, at *36. The trial court concluded: "Placing an actual value on Cari-some was extremely difficult because if it succeeded, the company would be worth billions, but if it failed, it would be worth nothing.” Id. at *26.

. Cf. Desimone v. Barrows, 924 A.2d 908, 943 (Del.Ch.2007) ("I also reject [the plaintiff's] contention that knowledge on the part of any one board member can be imputed to other board members as a result of their shared board or committee service.... Delaware law does not permit the wholesale imputation of one director’s knowledge to every other for demand excusal purposes.” (citations omitted)).

. A814.

. A817. Section 3.3 of the Plan affords the Board broad administrative authority. In relevant part, Section 3.3 provides:
3.3 Specific Powers. In particular, the Administrator shall have the authority:
... (iii) to authorize any person to execute, on behalf of the Company, any instrument required to carry out the purposes of the Plan; ... (ix) to amend any outstanding Awards, including for the purpose of modifying the time or manner of vesting, the purchase price or exercise price, or the term of any outstanding Award; ... and (xii) to exercise discretion to make any and all other determinations which it determines to be necessary or advisable for administration of the Plan.

Id.

. A835-36.

. A835.

. A1224 (emphasis added).

. A1225 (emphasis added).

. A766.

. Id.

. A767,

. Id.

. A789.

. A1191. With respect to the October 5, 2011 PwC presentation to the Board, the minutes also state:
The Board engaged in discussion with [PwC] to understand the assumptions and the methodology valuation. As required by the Merger Agreement with Miraca Holdings, Inc., the Board acknowledged the requirement of obtaining a second independent valuation of the TargetNow, Carisome and related business assets and instructed management to engage another reputable firm. [PwC] and Mr. Martino discussed that a second valuation would be sought from Grant Thornton.
Id. There are no findings suggesting that the PwC presentation did not occur or that the minutes axe an inaccurate account of the Board's'discussion. Compare Fox, 2015 WL 4571398, at *15-17 (“On October 5, 2011 the Board met telephonically with Citi, PwC, its legal counsel, and Caris executives to consider and approve an Agreement and Plan of Merger with Miraca.... The minutes of the October 5, 2011 meeting reflect that the Board recognized the need to adjust the exercise price of the stock options to reflect the value of the Spinoff.”), with RBC Capital Mkts., LLC v. Jervis, 129 A.3d 816, 835 (Del.2015) ("The trial court found, however, that the description of the process in the minutes was false....” (internal quotation marks omitted)), and In re Rural Metro Corp. S'hold *1049 ers Litig., 88 A.3d 54, 72 (Del.Ch.2014) (“The minutes ... have the feel of a document drafted in anticipation of litigation, and the rose-colored description of the sale process that appears in the minutes does not match up with what actually took place.”).

. A1148.

. A1161.

. A1162.

. A1163 (emphasis added).

. Id.

. A1191; A1399; A764-72, Cf. Fox, 2015 WL 4571398, at *32 (“At trial, the defense witnesses wisely tried to: distance themselves from Grant Thornton's work by. conceding that it was flawed and arguing that no one relied on it.”).

.A1193 (emphasis added). The October 5, 2011 resolutions also set forth the following recitals:
WHEREAS, pursuant to Section 11.1 of the Corporation Stock Plan, immediately prior to the consummation of the Merger, the Board will accelerate the vesting of each Option such that each Option is fully vested; • .
WHEREAS, upon the consummation of the Merger, all of the Options will be cancelled and converted into the right to receive the consideration set forth in ... the Merger Agreement^]
*1050 A1194.

. A1195. The Board also resolved "that, immediately prior to the consummation of the Merger, each Option shall have its vesting accelerated and shall be deemed folly vested[.]” Id.

. Laurie Johansen had business and law degrees from the University of Texas. After graduating from law school, she worked as a corporate associate at Akin Gump Strauss Hauer & Feld LLP. Thereafter, she was the general counsel and corporate secretary for a public company. In that capacity, she was responsible for the company's M & A and corporate finance projects.

.Grant Thornton clearly played a secondary and minimal advisory role, as reflected by the amount of work performed and the amount of compensation earned by them. See A802 (observing that the cost of Grant Thornton’s engagement amounted to $22,000). Although there are legitimate criticisms of the advisors’ analyses, the question for me is whether the Board reasonably relied on the advice of PwC. The unaddressed testimony recounted above, particularly Johansen’s, convinces me that it did.

. The trial court’s finding that “[ojver-whelming evidence in the record makes clear that in rendering its decision, PwC did not determine the fair market value of TargetNow and Carisome” should not be read to mean that it found that no valuation determination had been made. Fox, 2015 WL 4571398, at *13. Rather, the Court of Chancery found that the valuation provided was a transfer pricing valuation of intellectual property. Again, while the Board did not act perfectly, it did act. And there is no finding that a majority of the directors acted in subjective bad faith.

. A504.

. A430,

. A554.

. A431.

. A554.

. A555.

. A768.

. B753-54.

, A795-96 (emphasis added).

, In fact, the trial court concluded that the Board never saw the Grant Thornton report. See Fox, 2015 WL 4571398, at *4 (finding that Martino and Halbert "knew that the Board never saw the Grant Thornton report”).

, A555,

, A462,

, Id.

. A434.

, A437.

, A533,

. A546.

. During his deposition, Knowles was asked whether it was his "understanding that [PwC] provided a fair market value of the assets of Caris[,]” B754. He responded as follows: "The definition of fair market — market value is what you could sell it for, in my view. So if you ask me do I think that what was left of Caris after the disposal of the AP business was salable, then I have a,memory — I can’t remember what the numbers were, but I remember thinking that it would be very difficult to sell it for that kind of price.” B755. Further, when asked whether he had "any opinion at the time of the option repurchase in November of 201 i what the value of — the fair market value of [sic ] TargetNow business and Carisome business was[,]” he stated that *1053 he "remember[ed] thinking that [PwC’s] was a relatively generous valuation in the context of market value.... ” Id.

. A675.

. A676.

. Id.

. A745.

. A748.

. A756.

. A767.

. A760.

. A769.

. In my view, the record evidence before this Court does not support the conclusion that any of the directors were entirely unaware of his or her obligations under the Plan. Of the Company’s six directors, the trial court found only that Knowles "did not know that the Plan existed.” Fox, 2015 WL 4571398, at *23. But during his deposition, Knowles was asked whether "anybody from the Caris [B]oard” discussed with him the "cancellation or repurchase of options under th[e] Plan.” B753. Knowles answered: "There was a proposal presented to the [B]oard.” B753. Further, when asked whether he had "any idea what was paid” for the options, Knowles responded as follows: "I wouldn’t remember. I would believe that I had been part of that — I had heard a presentation and been part of that discussion. But I don’t remember.” Id. Knowles nonetheless expressed independent views as to FMV. Also, Knowles arrived from Finland the evening before trial and was deposed from 7:30 p.m. until 10:30 p.m. that samé night, three years after the Board acted pursuant to the Plan.

. A705.

. A723.

. Id.

. A711.

. Id.

. DV Realty Advisors, 75 A.3d at 110 (quoting Brinckerhoff v. Enbridge Energy Co., Inc., 67 A.3d 369, 373 (Del.2013)).

. A801. In various contexts, other courts have recognized the inherent difficulty in valuing medical science companies and calculating market value and potential profitability when such companies do not yet have marketable products. See, e.g., AlphaMed Pharms. Corp. v. Arriva Pharms., Inc., 432 F.Supp.2d 1319, 1345 (S.D.Fla.2006) (‘‘[0]nly a minuscule percentage of drugs in development ever reaches the commercial market — and of those, only a subset ever prove profitable for their manufacturer. Accordingly, reliance on a multitude of assumptions is endemic to any valuation of the prospective profitability of new pharmaceutical products.” (internal citation omitted)), aff'd, 294 Fed.Appx. 501 (11th Cir.2008). In the pharmaceutical context, Delaware courts have recently wrestled with expectation damages awards for breach of a contractual obligation to negotiate in good faith. See PharmAthene, Inc. v. SIGA Techs., Inc., 2011 WL 4390726 (Del.Ch. Sept. 22, 2011), aff'd in part and rev’d in part, 67 A.3d 330 (Del.2013), remanded to 2014 WL 3974167 (Del. Ch. Aug. 8, 2014), aff'd, 132 A.3d 1108 (Del.2015); see also id. at 1139-54 (Valihura, L, dissenting) (concluding in the dissent that expectation damages for breach of preliminary agreement to negotiate in good faith were speculative and too uncertain, contingent, and conjectural). Here, the molecular diagnostics technology market was emerging and both TargetNow and Carisome’s products endured significant “setbacks,” rendering the valuation exercise difficult and highly speculative. See Fox, 2015 WL 4571398, at *6-7.

. See, e.g., id. at *23 ("The Board could have empowered Halbert as a one-person committee. It didn't.").

. See May 5, 2015 Letter at 5-6, Fox v. CDX Holdings, Inc., C.A. No. 8031-VCL, 2015 WL 4571398 (Del. Ch. July 28, 2015) ("Rather, such adjustments were made to ensure that the amount paid to option holders by virtue of the Option Payment (which was based on the number of options that were actually issued and outstanding immediately prior to the Effective Time) included the value of the Target-Now and Carisome assets distributed to stockholders as part of the spin-off.”).

. Id. at 4-5.

. Id. at 5.

. Id.

. A1220.

. AR411.

. Id.

. A1399.

. The Board approved the Separation Agreement on October 5, 2011. Id.

. A1400.

. Id.

. A789; AR410-35, The October 5 resolutions should not be faulted-for failing to document the adjustment to the options, as the Merger Agreement and ancillary documents contemplated that any action with respect to the options would be taken immediately prior to the Effective Time, which was November 22, 2011.

. A765 (Q. "And also did the [BJoard approve an adjustment of the exercise price for the options to take into account the distribution of New Caris stock?” A. “Yes.”).

. Fox, 2015 WL 4571398, at *23 (emphasis in original and added).

. Id. at *3.

. Id. at *34. It is not evident from the record before this Court that Fox ever sought to understand the mechanics of the adjustments, the waterfall, or whether an adjustment to the options had in fact occurred. Nor is there evidence that Fox questioned Martinó and Citi, who created the equity waterfall, about the closing mechanics.

. Johansen testified that the Board was not responsible for developing the waterfall mechanics to'effect the adjustment. A789. Rather, this complicated exercise-was delegated to Martino and "the finance staff worldng with the bankers and [the] accountants.” Id. According to Johansen, Martino “spent many .¡countless hours trying to sort through it all . because of the complexity.” Id, In my view, . this is ¡the type of task that a Board is justified in.delegating to its CFO and advisors, and the Elan permits that delegation.

. Fox, 2015 WL 4571398, at *33-34.

. See A817-18. I do not address whether the trial court erred in employing the arbitrary and capricious standard developed in the context of decisions by administrative agencies. The question of whether the Board's decisions under the Plan were “arbitrary and capricious” was not identified in the parties' pre-trial order as one of the issues to be litigated at trial. I would have concluded that the argument was waived. Thus, I do not address the possibility that the Plan might have been breached under an arbitrary and capricious standard where, for example, the Board acted in subjective good faith but the valuation might have been manipulated.